*Attorney's fee; liability of Commission and United States for costs*

(k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

Pub.L. 88–352, Title VII, § 706, July 2, 1964, 78 Stat. 259; Pub.L. 92–261, § 4, Mar. 24, 1972, 86 Stat. 104.

13. While attorneys' fees have been routinely awarded to a prevailing plaintiff in civil rights cases unless special circumstances render such an award unjust, the purpose of such policy, namely to encourage the vindication of civil rights through private litigation, does not support a similarly liberal policy for awarding attorneys' fees to a prevailing defendant, unless the plaintiff's action was frivolous, unreasonable, or without foundation. *See Mosby v. Webster College*, 563 F.2d 901, 905 (8th Cir. 1977); *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1064 (8th Cir. 1975); *Guy v. Peaches Records & Tapes, Inc.*, 477 F.Supp. 656, 659 (E.D.Mo.1979), *appeal dismissed*, 604 F.2d 1108 (8th Cir. 1980); *Equal Employment v. Fry-Wagner Moving & Storage*, 465 F.Supp. 1214, 1218 (E.D.Mo. 1979). The Court is of the opinion that while plaintiff has overreacted emotionally, there is insufficient evidence before it to hold that his actions were not taken in good faith. While anger and poor judgment are factors to be considered by the Court in determining the good faith actions of plaintiffs in civil rights cases, they must be weighed against the totality of the circumstances. Subjective motivations, like all intentions, are often difficult to ascertain, and untoward punishment by the assessment of attorneys' fees against individuals claiming civil rights violations have precedential impact that is chilling and repressive. An award of attorneys' fees to defendants in cases such as this would discourage future meritorious litigation under Title VII. *Wright*, 524 F.2d at 1064. Ac-

cordingly, defendant's request for attorneys' fees is denied.

14. Accordingly, judgment is entered in favor of the defendant and against the plaintiff.

**UNITED STATES of America**

v.

**Juana Ituarte SOTO and Hector Soto.**

**No. EP–81–CR–92.**

United States District Court,
W. D. Texas,
El Paso Division.

June 25, 1981.

Rebecca Westfall, U. S. Atty., El Paso, Tex., for plaintiff.

Robert Ramos, Federal Public Defender, El Paso, Tex., for Juana Ituarte Soto.

John T. Garcia, El Paso, Tex., for Hector Soto.

## ORDER OVERRULING MOTIONS TO SUPPRESS

HUDSPETH, District Judge.

On April 12, 1981, an agent of the United States Border Patrol stopped a 1967 Chevrolet driven by Defendant Hector Soto, and in which Defendant Juana Soto was riding as a passenger. Three illegal aliens from Belize were discovered riding in the automobile. Defendants move to suppress all fruits of the stop and search of the vehicle, contending that it was not supported by probable cause or reasonable suspicion.

Alfred Sheard is a Border Patrol Agent stationed in Fabens, Texas. For some three years, he has heard of Defendant Juana Soto as the owner of a home allegedly used as a "drop house"[1] for illegal aliens. Her home is located in the rural community of San Elizario, Texas, and is less than one-fourth of a mile from the boundary between the United States and Mexico. A favorite crossing point for illegal aliens, known as "Peachtree Lane," is in the immediate area of her home. Although there are three or four other residences in the area, Defendant's home is somewhat isolated, and is the nearest of the residences to the international boundary.

Beginning in December 1980, Agent Sheard began to receive specific information about activities at Mrs. Soto's home. On two occasions, Customs Patrol Agents advised him that they had seen aliens being guided over Peachtree Lane to Defendant's house. In late 1980 and early 1981, Sheard had "tracked" groups of people on several occasions from the river crossing to the Soto home. Between January 18 and February 5, 1981, five "loads" of illegal aliens were stopped in the Fabens-San Elizario-Ysleta area of El Paso County, in which the aliens, upon interrogation, advised the Border Patrol officers that they had come from Defendant Soto's house. On one occasion, the driver was a nephew of Juana Soto; on another, her "boy friend." Agent Sheard had participated personally in two of these apprehensions of illegal aliens.

On March 25, 1981, about seventeen days before the instant case, some fourteen illegal aliens (12 from the Dominican Republic and 2 from El Salvador) had been arrested in Mrs. Soto's house. They had been seen crossing into the United States, and walking to the Soto home. For reasons not explained in the record, it appears that no charges were filed against Juana Soto in connection with this incident.

The first two weeks in April, Agent Sheard engaged in intermittent surveillance of the Defendant's home. On April 12, he was parked near Gonzales Road in San Elizario, some 150 yards from the Soto house, in a plain, unmarked brown car. About 9:45 P.M., he saw a 1967 white Chevrolet approaching him on the dirt road that leads from the house. The road is described as unmaintained and "barely passable." It was Sheard's impression that the car was

[1]. In Border Patrol terminology, a house that is used to hide or assemble aliens who have entered the United States illegally, and who are waiting for transportation to other locations in the interior.

driving "too fast" for the road conditions. He followed the car into San Elizario, and radioed for a registration check on the license plate. Although the car bore Texas license plates, the reply was "no registration information."

Agent Sheard followed the car for 6 or 7 miles. It turned on Socorro Road, and headed west toward El Paso. It then turned north on Passmore Road. Just before the intersection of Passmore and Alameda Avenue (Texas Highway 20), the road goes over a high bridge. As Sheard followed the Chevrolet over the bridge and down to ground level again, he had a good view into the interior of the car. He saw three people in the front seat and two in the back seat. The passenger in the middle of the front seat appeared to be Juana Soto. As his headlights drew near, the two back seat passengers turned to look, and, upon seeing Sheard in his Border Patrol uniform, did a "double take" and spoke to the driver. The driver looked in the rear-view mirror. He then turned left on Alameda, and right again on a dirt road leading into a subdivision under construction. Having concluded that the Chevrolet contained Juana Soto and a group of illegal aliens, Agent Sheard made his decision and stopped the car.

 A roving patrol may stop vehicles for the limited purpose of questioning occupants about their citizenship if the agent is aware of specific articulable facts, together with reasonable inferences from those facts, which reasonably warrant suspicion that the vehicle contains illegal aliens. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). The totality of the circumstances (the "whole picture") must be considered, and must give the officers a "particularized and objective basis" for stopping the vehicle. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Among the factors to be considered are the characteristics of the area where the stop is made; its proximity to the border; infor-

mation about illegal border crossings in that area in the recent past; the officer's experience with alien traffic; characteristics of the suspect vehicle, and suspicious behavior of its occupants. *United States v. Brignoni-Ponce, supra*, 422 U.S. at 886, 95 S.Ct. 2574, 2582.

 A vital element of the *Brignoni-Ponce* test is reason to believe that the suspect vehicle has come from the border. *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir. 1979). In the instant case, the Chevrolet was first seen within a few hundred yards of the border itself, headed inland. The arresting officer, an experienced Border Patrolman, was aware of innumerable border crossings by illegal aliens in that specific area. Even more significantly, the vehicle was headed away from a known "drop house," which had been implicated in at least six apprehensions of illegal aliens within the preceding three months.[2] Further observations of significance prior to the stop included the fact that the license plate on the Chevrolet was not of record; that Juana Soto herself was a passenger in the car; the startled behavior of the occupants when they observed a Border Patrolman following them; and finally, the turning of the vehicle into a dirt road leading nowhere, giving rise to a reasonable belief that the occupants intended to run. The suspicious circumstances, when taken as a whole, justified a reasonable suspicion that the car contained illegal alien passengers. The stop of the vehicle for investigative purposes was warranted, and the motion to suppress should be denied.

It is therefore ORDERED that the Defendants' motions to suppress evidence be, and they are hereby, DENIED.

---

**2.** Although the Government has not cited a square holding on the subject, a recent Fifth Circuit case indicates the significance of travel to and from "drop houses." *United States v. Pena-Cantu*, 639 F.2d 1228, 1229–30 n. 1 (5th Cir. 1981).