# UNITED STATES v. BRIGNONI-PONCE

No. 74–114.   Argued February 18, 1975—Decided June 30, 1975

*Deputy Solicitor General Frey* argued the cause for the United States. On the briefs were *Solicitor General Bork, Assistant Attorney General Petersen, Acting Assistant Attorney General Keeney, Mark L. Evans, Peter M. Shannon, Jr.,* and *Jerome M. Feit.*

*John J. Cleary,* by appointment of the Court, 419 U. S. 1017, argued the cause for respondent. With him on the brief was *Charles M. Sevilla.**

MR. JUSTICE POWELL delivered the opinion of the Court.

This case raises questions as to the United States Border Patrol's authority to stop automobiles in areas near the Mexican border. It differs from our decision in *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), in that the Border Patrol does not claim authority to search cars, but only to question the occupants about their citizenship and immigration status.

I

As part of its regular traffic-checking operations in southern California, the Border Patrol operates a fixed checkpoint on Interstate Highway 5 south of San Clemente. On the evening of March 11, 1973, the checkpoint was closed because of inclement weather, but two officers were observing northbound traffic from a patrol

---

*Sanford Jay Rosen* filed a brief for the Mexican American Legal Defense and Educational Fund as *amicus curiae* urging affirmance.

car parked at the side of the highway. The road was dark, and they were using the patrol car's headlights to illuminate passing cars. They pursued respondent's car and stopped it, saying later that their only reason for doing so was that its three occupants appeared to be of Mexican descent. The officers questioned respondent and his two passengers about their citizenship and learned that the passengers were aliens who had entered the country illegally. All three were then arrested, and respondent was charged with two counts of knowingly transporting illegal immigrants, a violation of § 274 (a) (2) of the Immigration and Nationality Act, 66 Stat. 228, 8 U. S. C. § 1324 (a)(2). At trial respondent moved to suppress the testimony of and about the two passengers, claiming that this evidence was the fruit of an illegal seizure. The trial court denied the motion, the aliens testified at trial, and respondent was convicted on both counts.

Respondent's appeal was pending in the Court of Appeals for the Ninth Circuit when we announced our decision in *Almeida-Sanchez* v. *United States, supra,* holding that the Fourth Amendment prohibits the use of roving patrols to search vehicles, without a warrant or probable cause, at points removed from the border and its functional equivalents. The Court of Appeals, sitting en banc, held that the stop in this case more closely resembled a roving-patrol stop than a stop at a traffic checkpoint, and applied the principles of *Almeida-Sanchez.*[1]

---

[1] For the Court of Appeals' purposes, the distinction between a roving patrol and a fixed checkpoint was controlling. The court previously had held that the principles of *Almeida-Sanchez* v. *United States* applied retrospectively to the activities of roving patrols but not to those of fixed checkpoints. See *United States* v. *Peltier,* 500 F. 2d 985 (CA9 1974), rev'd, *ante,* p. 531; *United States* v. *Bowen,* 500 F. 2d 960 (CA9 1974), aff'd, *post,* p. 916.

The court held that the Fourth Amendment, as interpreted in *Almeida-Sanchez,* forbids stopping a vehicle, even for the limited purpose of questioning its occupants, unless the officers have a "founded suspicion" that the occupants are aliens illegally in the country. The court refused to find that Mexican ancestry alone supported such a "founded suspicion" and held that respondent's motion to suppress should have been granted.[2] 499 F. 2d 1109 (1974). We granted certiorari and set the case for oral argument with No. 73–2050, *United States* v. *Ortiz, post,* p. 891, and No. 73–6848, *Bowen* v. *United States, post,* p. 916. 419 U. S. 824 (1974).

The Government does not challenge the Court of Appeals' factual conclusion that the stop of respondent's car was a roving-patrol stop rather than a checkpoint stop. Brief for United States 8. Nor does it challenge the retroactive application of *Almeida-Sanchez, supra,* Brief for United States 9, or contend that the San Clemente checkpoint is the functional equivalent of the border. The only issue presented for decision is whether a roving patrol may stop a vehicle in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry. For the reasons that follow, we affirm the decision of the Court of Appeals.

## II

The Government claims two sources of statutory au-

---

[2] There may be room to question whether voluntary testimony of a witness at trial, as opposed to a Government agent's testimony about objects seized or statements overheard, is subject to suppression as the fruit of an illegal search or seizure. See *United States* v. *Guana-Sanchez,* 484 F. 2d 590 (CA7 1973), cert. dismissed as improvidently granted, 420 U. S. 513 (1975). But since the question was not raised in the petition for certiorari, we do not address it.

thority for stopping cars without warrants in the border areas. Section 287 (a)(1) of the Immigration and Nationality Act, 8 U. S. C. § 1357 (a)(1), authorizes any officer or employee of the Immigration and Naturalization Service (INS) without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." There is no geographical limitation on this authority. The Government contends that, at least in the areas adjacent to the Mexican border, a person's apparent Mexican ancestry alone justifies belief that he or she is an alien and satisfies the requirement of this statute. Section 287 (a)(3) of the Act, 8 U. S. C. § 1357 (a)(3), authorizes agents, without a warrant,

> "within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle . . . ."

Under current regulations, this authority may be exercised anywhere within 100 miles of the border. 8 CFR § 287.1 (a) (1975). The Border Patrol interprets the statute as granting authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle.[3] But "no Act of Congress can authorize a violation of the Constitution," *Almeida-Sanchez, supra,* at 272,

---

[3] We cannot accept respondent's contention that, even though § 287 (a)(3) does not mention probable cause, its legislative history establishes that Congress meant to condition immigration officers' authority to board and search vehicles on probable cause to believe that they contained aliens. The legislative history simply does not support this contention.

and we must decide whether the Fourth Amendment allows such random vehicle stops in the border areas.

## III

The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis* v. *Mississippi,* 394 U. S. 721 (1969); *Terry* v. *Ohio,* 392 U. S. 1, 16–19 (1968). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *id.,* at 16, and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Id.,* at 20–21; *Camara* v. *Municipal Court,* 387 U. S. 523, 536–537 (1967).

The Government makes a convincing demonstration that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border. Estimates of the number of illegal immigrants in the United States vary widely. A conservative estimate in 1972 produced a figure of about one million, but the INS now suggests there may be as many as 10 or 12 million aliens illegally in the country.[4] Whatever the number, these aliens create significant economic and social problems, competing with citizens and legal resident

---

[4] The estimate of one million was produced by the Commissioner of the INS for the Immigration and Nationality Subcommittee of the House Judiciary Committee. Hearings on Illegal Aliens before Subcommittee No. 1 of the House Committee on the Judiciary, 92d Cong., 2d Sess., ser. 13, pt. 5, pp. 1323–1325 (1972). The higher estimate appears in the INS Ann. Rep. iii (1974).

aliens for jobs, and generating extra demand for social services. The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation. See generally Hearings on Illegal Aliens before Subcommittee No. 1 of the House Committee on the Judiciary, 92d Cong., 1st and 2d Sess., ser. 13, pts. 1–5 (1971–1972).

The Government has estimated that 85% of the aliens illegally in the country are from Mexico. *United States v. Baca*, 368 F. Supp. 398, 402 (SD Cal. 1973).[5] The Mexican border is almost 2,000 miles long, and even a vastly reinforced Border Patrol would find it impossible to prevent illegal border crossings. Many aliens cross the Mexican border on foot, miles away from patrolled areas, and then purchase transportation from the border area to inland cities, where they find jobs and elude the immigration authorities. Others gain entry on valid temporary border-crossing permits, but then violate the conditions of their entry. Most of these aliens leave the border area in private vehicles, often assisted by professional "alien smugglers." The Border Patrol's traffic-checking operations are designed to prevent this inland movement. They succeed in apprehending some illegal entrants and smugglers, and they deter the movement of others by threatening apprehension and increasing the cost of illegal transportation.

Against this valid public interest we must weigh the interference with individual liberty that results when an officer stops an automobile and questions its occupants.

---

[5] This estimate tends to be confirmed by the consistently high proportion of Mexican nationals in the number of deportable aliens arrested each year. In 1970, for example, 80% of the deportable aliens arrested were from Mexico. See INS Ann. Rep. 95 (1970). In 1974, the figure was 92%. INS Ann. Rep. 94 (1974).

The intrusion is modest. The Government tells us that a stop by a roving patrol "usually consumes no more than a minute." Brief for United States 25. There is no search of the vehicle or its occupants, and the visual inspection is limited to those parts of the vehicle that can be seen by anyone standing alongside.[6] According to the Government, "[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Ibid.*

Because of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest. In *Terry* v. *Ohio, supra,* the Court declined expressly to decide whether facts not amounting to probable cause could justify an "investigative 'seizure'" short of an arrest, 392 U. S., at 19 n. 16, but it approved a limited search—a pat-down for weapons—for the protection of an officer investigating suspicious behavior of persons he reasonably believed to be armed and dangerous. The Court approved such a search on facts that did not constitute probable cause to believe the suspects guilty of a crime, requiring only that "the police officer . . . be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a belief that his safety or that of others is in danger. *Id.,* at 21; see *id.,* at 27.

We elaborated on *Terry* in *Adams* v. *Williams,* 407 U. S. 143 (1972), holding that a policeman was justified

---

[6] In this case the officers did search respondent's car, but because they found no other incriminating evidence the validity of the search is not in issue. *Almeida-Sanchez* changed the Border Patrol's practice of searching cars on routine stops, and the Government informs us that roving patrols now search vehicles only when they have probable cause to believe they will find illegally present aliens or contraband. Brief for United States 25.

in approaching the respondent to investigate a tip that he was carrying narcotics and a gun.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.*, at 145–146.

These cases together establish that in appropriate circumstances the Fourth Amendment allows a properly limited "search" or "seizure" on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. In both *Terry* and *Adams* v. *Williams* the investigating officers had reasonable grounds to believe that the suspects were armed and that they might be dangerous. The limited searches and seizures in those cases were a valid method of protecting the public and preventing crime. In this case as well, because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry*, the stop and inquiry must be "reasonably related in scope to the justification for their initiation." 392 U. S., at 29. The officer may question the driver and passengers about their citizenship and

immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops.[7] In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government. Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. San Diego, with a metropolitan population of 1.4 million, is located on the border. Texas has two fairly large metropolitan areas directly on the border: El Paso, with a population of 360,000, and the Brownsville-McAllen area, with a combined population of 320,000. We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens. To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. The only formal limitation on that discretion appears to be the administrative regulation defining the term "reasonable distance" in § 287 (a)(3) to mean within 100

---

[7] Because the stop in this case was made without a warrant and the officers made no effort to obtain one, we have no occasion to decide whether a warrant could be issued to stop cars in a designated area on the basis of conditions in the area as a whole and in the absence of reason to suspect that any particular car is carrying aliens. See *Almeida-Sanchez,* 413 U. S., at 275 (POWELL, J., concurring); *Camara* v. *Municipal Court,* 387 U. S. 523 (1967).

air miles from the border. 8 CFR § 287.1 (a) (1975). Thus, if we approved the Government's position in this case, Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law.

We are not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic. As we discuss in Part IV, *infra*, the nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators. Consequently, a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. Under the circumstances, and even though the intrusion incident to a stop is modest, we conclude that it is not "reasonable" under the Fourth Amendment to make such stops on a random basis.[8]

The Government also contends that the public interest in enforcing conditions on legal alien entry justifies stopping persons who may be aliens for questioning about their citizenship and immigration status. Although we

---

[8] Our decision in this case takes into account the special function of the Border Patrol, the importance of the governmental interests in policing the border area, the character of roving-patrol stops, and the availability of alternatives to random stops unsupported by reasonable suspicion. Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters.

may assume for purposes of this case that the broad congressional power over immigration, see *Kleindienst* v. *Mandel*, 408 U. S. 753, 765–767 (1972), authorizes Congress to admit aliens on condition that they will submit to reasonable questioning about their right to be and remain in the country, this power cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens. For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.

## IV

The effect of our decision is to limit exercise of the authority granted by both § 287 (a)(1) and § 287 (a)(3). Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.[9]

Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual pat-

---

[9] As noted above, we reserve the question whether Border Patrol officers also may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country. See *Cheung Tin Wong* v. *INS*, 152 U. S. App. D. C. 66, 468 F. 2d 1123 (1972); *Au Yi Lau* v. *INS*, 144 U. S. App. D. C. 147, 445 F. 2d 217, cert. denied, 404 U. S. 864 (1971). The facts of this case do not require decision on the point.

terns of traffic on the particular road, and previous experience with alien traffic are all relevant. See *Carroll v. United States,* 267 U. S. 132, 159–161 (1925); *United States* v. *Jaime-Barrios,* 494 F. 2d 455 (CA9), cert. denied, 417 U. S. 972 (1974).[10] They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. See *United States* v. *Larios-Montes,* 500 F. 2d 941 (CA9 1974); *Duprez* v. *United States,* 435 F. 2d 1276 (CA9 1970). Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens. See *United States* v. *Bugarin-Casas,* 484 F. 2d 853 (CA9 1973), cert. denied, 414 U. S. 1136 (1974); *United States* v. *Wright,* 476 F. 2d 1027 (CA5 1973). The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. See *United States* v. *Larios-Montes, supra.* The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. Reply Brief for United States 12–13, in *United States* v. *Ortiz, post,* p. 891. In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. *Terry* v. *Ohio,* 392 U. S., at 27.

In this case the officers relied on a single factor to justify stopping respondent's car: the apparent Mexican an-

---

[10] The Courts of Appeals decisions cited throughout this part are merely illustrative. Our citation of them does not imply a view of the merits of particular decisions. Each case must turn on the totality of the particular circumstances.

cestry of the occupants.[11]   We cannot conclude that this
furnished reasonable grounds to believe that the three
occupants were aliens.   At best the officers had only a
fleeting glimpse of the persons in the moving car, illumi-
nated by headlights.   Even if they saw enough to think
that the occupants were of Mexican descent, this factor
alone would justify neither a reasonable belief that they
were aliens, nor a reasonable belief that the car concealed
other aliens who were illegally in the country.   Large
numbers of native-born and naturalized citizens have the
physical characteristics identified with Mexican ancestry,
and even in the border area a relatively small propor-
tion of them are aliens.[12]   The likelihood that any given

---

[11] The Government also argues that the location of this stop
should be considered in deciding whether the officers had ade-
quate reason to stop respondent's car.   This appears, however,
to be an after-the-fact justification.   At trial the officers gave no
reason for the stop except the apparent Mexican ancestry of the
car's occupants.   It is not even clear that the Government presented
the broader justification to the Court of Appeals.   We therefore
decline at this stage of the case to give any weight to the location
of the stop.

[12] The 1970 census and the INS figures for alien registration in
1970 provide the following information about the Mexican-American
population in the border States.   There were 1,619,064 persons of
Mexican origin in Texas, and 200,004 (or 12.4%) of them registered
as aliens from Mexico.   In New Mexico there were 119,049 persons
of Mexican origin, and 10,171 (or 8.5%) registered as aliens.   In Ari-
zona there were 239,811 persons of Mexican origin, and 34,075 (or
14.2%) registered as aliens.   In California there were 1,857,267 per-
sons of Mexican origin, and 379,951 (or 20.4%) registered as aliens.
Bureau of the Census, Subject Report PC (2)–1C: Persons of Span-
ish Origin 2 (1970); INS Ann. Rep. 105 (1970).   These figures, of
course, do not present the entire picture.   The number of registered
aliens from Mexico has increased since 1970, INS Ann. Rep. 105
(1974), and we assume that very few illegal immigrants appear in
the registration figures.   On the other hand, many of the 950,000
other persons of Spanish origin living in these border States, see

person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.

The judgment of the Court of Appeals is

*Affirmed.*

[For opinion of THE CHIEF JUSTICE concurring in the judgment, see *post,* p. 899.]

[For opinion of MR. JUSTICE WHITE concurring in the judgment, see *post,* p. 914.]

MR. JUSTICE REHNQUIST, concurring.

I join in the opinion of the Court. I think it quite important to point out, however, that that opinion, which is joined by a somewhat different majority than that which comprised the *Almeida-Sanchez* Court, is both by its terms and by its reasoning concerned only with the type of stop involved in this case. I think that just as travelers entering the country may be stopped and searched without probable cause and without founded suspicion, because of "national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in," *Carroll* v. *United States,* 267 U. S. 132, 154 (1925), a strong case may be made for those charged with the enforcement of laws conditioning the right of vehicular use of a highway to likewise stop motorists using highways in order to determine whether they have met the qualifications prescribed by applicable law for such use. See *Cady* v. *Dombrowski,* 413 U. S. 433, 440–441 (1973); *United States* v. *Biswell,* 406 U. S. 311 (1972). I regard these and similar situations, such

Bureau of the Census, *supra,* at 1, may have a physical appearance similar to persons of Mexican origin.

as agricultural inspections and highway roadblocks to apprehend known fugitives, as not in any way constitutionally suspect by reason of today's decision.

MR. JUSTICE DOUGLAS, concurring in the judgment.

I join in the affirmance of the judgment. The stopping of respondent's automobile solely because its occupants appeared to be of Mexican ancestry was a patent violation of the Fourth Amendment. I cannot agree, however, with the standard the Court adopts to measure the lawfulness of the officers' action. The Court extends the "suspicion" test of *Terry* v. *Ohio*, 392 U. S. 1 (1968), to the stop of a moving automobile. I dissented from the adoption of the suspicion test in *Terry*, believing it an unjustified weakening of the Fourth Amendment's protection of citizens from arbitrary interference by the police. I remarked then:

> "The infringement on personal liberty of any 'seizure' of a person can only be 'reasonable' under the Fourth Amendment if we require the police to possess 'probable cause' before they seize him. Only that line draws a meaningful distinction between an officer's mere inkling and the presence of facts within the officer's personal knowledge which would convince a reasonable man that the person seized has committed, is committing, or is about to commit a particular crime." *Id.*, at 38.

The fears I voiced in *Terry* about the weakening of the Fourth Amendment have regrettably been borne out by subsequent events. Hopes that the suspicion test might be employed only in the pursuit of violent crime—a limitation endorsed by some of its proponents*—have now been dashed, as it has been applied

---

*See LaFave, "Street Encounters" and the Constitution, 67 Mich. L. Rev. 39, 65–66 (1968).

in narcotics investigations, in apprehension of "illegal" aliens, and indeed has come to be viewed as a legal construct for the regulation of a general investigatory police power. The suspicion test has been warmly embraced by law enforcement forces and vigorously employed in the cause of crime detection. In criminal cases we see those for whom the initial intrusion led to the discovery of some wrongdoing. But the nature of the test permits the police to interfere as well with a multitude of law-abiding citizens, whose only transgression may be a nonconformist appearance or attitude. As one commentator has remarked:

> " 'Police power exercised without probable cause *is* arbitrary. To say that the police may accost citizens at their whim and may detain them upon reasonable suspicion is to say, in reality, that the police may both accost and detain citizens at their whim.' " Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 395 (1974).

The uses to which the suspicion test has been put are illustrated in some of the cases cited in the Court's opinion. In *United States* v. *Wright,* 476 F. 2d 1027 (CA5 1973), for example, immigration officers stopped a station wagon near the border because there was a spare tire in the back seat. The court held that the officers reasonably suspected that the spare wheel well had been freed in order to facilitate the concealment of aliens. In *United States* v. *Bugarin-Casas,* 484 F. 2d 853 (CA9 1973), the Border Patrol officers encountered a man driving alone in a station wagon which was "riding low"; stopping the car was held reasonable because the officers suspected that aliens might have been hidden beneath the floorboards. The vacationer whose car is weighted down with luggage will find no comfort in these decisions; nor will the many law-abiding citi-

zens who drive older vehicles that ride low because their suspension systems are old or in disrepair. The suspicion test has indeed brought a state of affairs where the police may stop citizens on the highway on the flimsiest of justifications.

The Court does, to be sure, disclaim approval of the particular decisions it cites applying the suspicion test. But by specifying factors to be considered without attempting to explain what combination is necessary to satisfy the test, the Court may actually induce the police to push its language beyond intended limits and to advance as a justification any of the enumerated factors even where its probative significance is negligible.

Ultimately the degree to which the suspicion test actually restrains the police will depend more upon what the Court does henceforth than upon what it says today. If my Brethren mean to give the suspicion test a new bite, I applaud the intention. But in view of the developments since the test was launched in *Terry*, I am not optimistic. This is the first decision to invalidate a stop on the basis of the suspicion standard. In fact, since *Terry* we have granted review of a case applying the test only once, in *Adams* v. *Williams*, 407 U. S. 143 (1972), where the Court found the standard satisfied by the tip from an informant whose credibility was not established and whose information was not shown to be based upon personal knowledge. If in the future the suspicion test is to provide any meaningful restraint of the police, its force must come from vigorous review of its applications, and not alone from the qualifying language of today's opinion. For now, I remain unconvinced that the suspicion test offers significant protection of the "comprehensive right of personal liberty in the face of governmental intrusion," *Lopez* v. *United States*, 373 U. S. 427, 455 (1963) (dissenting opinion), that is embodied in the Fourth Amendment.