REVISED, July 12, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-40620
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ARTURO HERNANDEZ-ZUNIGA

Defendant-Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 14, 2000

Before KING, Chief Judge, and REAVLEY and STEWART, Circuit
Judges.

KING, Chief Judge:

Following a bench trial, Defendant-Appellant Arturo
Hernandez-Zuniga was convicted of possession of cocaine with
intent to distribute.  He appeals his conviction and sentence,
arguing that the district court erred in refusing to grant his
motion to suppress.  We AFFIRM.

I.

Valley Transit Company ("VTC") is a commercial bus company that provides regularly scheduled passenger bus service in Texas. On December 11, 1998, a VTC bus was traveling on U.S. Highway 77 during regularly scheduled passenger service between Brownsville and Corpus Christi.[1]  Around 12:20 a.m., the bus was pulled over outside of Riviera, Texas by the United States Border Patrol. Border Patrol Agent Reynaldo Atanacio and his partner boarded the bus and Atanacio announced: "U.S. Border Patrol, U.S. inspection. If you're not a citizen of the United States please have your immigration documents ready to present to me."  Atanacio and his partner then began inquiring as to the passengers' citizenship.

While Atanacio was questioning a passenger in the second row, he glanced up and made eye contact with Defendant-Appellant Arturo Hernandez-Zuniga ("Hernandez"), who was sitting in the third row.  Hernandez waved at Atanacio and said "U.S. citizen, Officer."  Atanacio directed Hernandez to stay in his seat and stated that he would get to him shortly.  When Atanacio proceeded to Hernandez and inquired as to his citizenship, Hernandez stated that he was a U.S. citizen.  Atanacio then asked Hernandez where he was traveling to and from, and Hernandez said that he was traveling from Brownsville to Houston.  At this point, Atanacio

---

[1]  Highway 77 comes within one-half mile of the U.S.-Mexico border and is known to law enforcement agencies as a major thoroughfare for illegal aliens and narcotics traffickers.  As a result, a number of permanent checkpoints are set up along the road and Border Patrol agents regularly patrol the highway.

2

noticed that Hernandez was becoming increasingly nervous. Concerned for his safety, Atanacio asked Hernandez whether he was carrying any weapons. Hernandez became agitated and answered that he did not have any weapons. He then jumped out of his seat and asked: "Do you want to check on the seat and everything?"

Atanacio instructed Hernandez to sit down, and then proceeded to look around and under Hernandez's seat. He then noticed that Hernandez's coat, which was on the neighboring seat, was covering a small black bag. Upon questioning, Hernandez stated that the bag was his and that it contained clothes. Atanacio asked Hernandez if he would mind opening the bag. Hernandez agreed, and Atanacio observed that the bag did indeed contain clothing. Atanacio then requested permission from Hernandez to conduct a more thorough search of the bag and Hernandez consented.

During the search, Atanacio found two hard bundles wrapped in shirts. As Atanacio lifted the bundles out of the bag, Hernandez stated: "Oh, that's not mine." Atanacio punctured one of the bundles with his knife and observed that it contained a white powder, which he believed to be narcotics. Atanacio then placed Hernandez under arrest and transported him to a nearby weigh station for further questioning. After being read his Miranda rights, Hernandez admitted that he knew the bundles were cocaine, and that he was transporting the drugs from Brownsville to Houston for an unnamed individual.

Prior to trial, Hernandez moved to suppress the cocaine. He argued that the initial stop of the bus by the Border Patrol constituted an unlawful seizure under the Fourth Amendment. Therefore, any evidence arising from that stop was tainted and should be suppressed.

At the suppression hearing, the district court heard testimony from Ben Rios, the Director of Operations at VTC. Rios testified that VTC has a long-running practice of cooperating with law enforcement agencies. Rios stated that VTC keeps the Border Patrol informed of its buses' routes and time-tables, and that the company encourages the Border Patrol to pull over VTC buses and conduct immigration inspections. Rios also stated that the company requires its drivers to pull over and cooperate if the Border Patrol signals the bus to stop — even if it means the bus will be late in arriving at its destination.

Rios explained that VTC adopted this policy for two reasons. First, the company believed that the law required the buses to stop when signaled to do so by the Border Patrol. Second, Rios stated that random stops and inspections by the Border Patrol provided a benefit to the company. Because VTC does not pick up passengers only at regularly scheduled stops, but will pick up anyone who flags down a bus, Rios noted that it is difficult to control who is traveling on VTC's buses and what they are carrying on board. As a result, VTC views random stops and inspections by the Border Patrol as beneficial. Therefore, Rios

testified, VTC not only consents to, but encourages, the stops.

The district court also heard from the driver of the bus, Dionicio Areguellin. Areguellin testified that random stops by the Border Patrol were common on this route, and that the bus had already been stopped by the Border Patrol twice that evening before being stopped by Atanacio. Areguellin testified that he always cooperated during these stops and that he cooperated on this occasion. Areguellin stated that, while his managers had not directly told him to always stop for the Border Patrol, "everybody knows" that you are to pull over and stop when signaled to do so.

Agent Atanacio also testified at the hearing. He stated that the area where the bus was stopped is notorious for drug and alien smuggling. Atanacio testified that he finds illegal aliens aboard seventy-five percent of the commercial buses he stops for immigration inspections. He also stated that, on average, the immigration inspections only take ten to fifteen minutes. Atanacio testified that, because illegal alien smugglers often scout out Border Patrol checkpoints to see if the stations are open or closed, he would often stop buses for inspections when, as here, the closest permanent checkpoint (at Sarita) was closed. Furthermore, Atanacio testified that when the checkpoints are open, illegal aliens often try to avoid detection by getting off the bus before it reaches a checkpoint and then circumventing the checkpoint on foot. Once they are around the checkpoint, the

5

aliens will simply flag down a bus and continue their journey.

The district court found that VTC and the bus driver consented to the stop by the Border Patrol. Because the stop was consensual, the district court reasoned that the stop was constitutional and did not violate Hernandez's Fourth Amendment rights. Hernandez waived his right to a jury trial and, following a bench trial, he was found guilty of possession of cocaine with intent to distribute and sentenced to 72 months in prison. Hernandez timely appeals.

## II.

We apply a two-tiered standard of review to a district court's denial of a motion to suppress. We review the court's factual findings for clear error and its "ultimate conclusion as to the constitutionality of the law enforcement action de novo." See United States v. Chavez-Villarreal, 3 F.3d 124, 126 (5th Cir. 1993). Finding that the district court did not err in either its factual or legal conclusions, we affirm Hernandez's conviction and sentence.

On appeal, Hernandez argues only that the initial stop of the bus by the Border Patrol constituted an unlawful seizure under the Fourth Amendment.[2] Hernandez contends that because the

---

[2] We note in particular that Hernandez does not argue that the agent's initial questioning, without reasonable suspicion, violated the Fourth Amendment.

6

Border Patrol agents who stopped the bus had neither a warrant nor reasonable suspicion that criminal activity was taking place on board, the stop was unconstitutional and any evidence emanating from it should be suppressed.

The government responds to Hernandez's argument by stating that, while the Border Patrol may not have had reasonable suspicion to stop the bus, the stop was nonetheless constitutional because it was conducted pursuant to VTC's consent. The government argues that VTC's consent alone was sufficient to render the stop constitutional.

The district court agreed with the government. Because the evidence showed that VTC consented to random stops of its buses by the Border Patrol, the district court ruled that the stop in question was constitutional. The district court emphasized that, as a passenger on the bus, Hernandez did not have any control over when or where the bus would stop en route. The court noted that the bus was liable to make any number of unscheduled stops once a journey had begun, including stops to pick up passengers who flagged down the bus. Because Hernandez had surrendered to the bus company the power to make unscheduled stops, including stops to let other passengers on board, the district court ruled that he "cannot complain that the bus company stops to let Border Patrol agents, whom it desires to be on the bus, board the bus en route."

The Fourth Amendment guarantees that the "right of the

people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ."  In the context of this case, the Amendment protects a person's interest in freedom of movement and seeks to ensure that he will not be subject to random and arbitrary seizures.  See, e.g., Delaware v. Prouse, 440 U.S. 648, 657 (1979) (noting that the random stop of an automobile by the police interferes with a person's "freedom of movement, [is] inconvenient, and consume[s] time").  It is the case, however, that "the extent to which the Fourth Amendment protects people may depend upon where those people are."  Minnesota v. Carter, 525 U.S. 83, 88 (1998).

At issue is whether the Border Patrol's stopping a public bus on which Hernandez was a passenger resulted in Hernandez being seized in violation of the Fourth Amendment.  The Supreme Court has held that a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  Brower v. County of Inyo, 489 U.S. 593, 597 (1989) (emphasis deleted); see also Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990) (noting that a Fourth Amendment seizure occurs when a vehicle is stopped at a temporary, randomly placed, sobriety checkpoint); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976) (noting agreement that stops at a checkpoint for detecting illegal aliens was a Fourth Amendment seizure).  We assume for purposes of this opinion that Hernandez was seized by the Border Patrol agents.

8

The question thus becomes whether the seizure was reasonable. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) ("[T]he Fourth Amendment requires that the seizure be 'reasonable.'"). "The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Brown v. Texas, 443 U.S. 47, 50 (1979) (citations and internal quotation marks omitted). This test requires us to consider "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id. at 51. In the case before us, we have the additional consideration of the effect of VTC's consent.

Although the concept of third party consent has been most often applied in the context of searches, it can also be applied to seizures. See United States v. Woodrum, 202 F.3d 1, 11 (1st Cir. 2000). In the context of searches, it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search. In United States v. Matlock, 415 U.S. 164, 171 (1974), the Court held that the consent of a person with common authority over a shared bedroom legitimated a warrantless search of the room and that the consent of the other occupant was not necessary. The

9

Court noted that "it is reasonable to recognize that any of the co-inhabitants [of the room] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. 415 U.S. at 171 n. 7. We have found this reasoning to be equally applicable to consensual searches of automobiles. See United States v. Crain, 33 F.3d 480, 484 (5th Cir. 1994); United States v. Baldwin, 644 F.2d 381, 383 (5th Cir. Unit A 1981) (per curiam) (holding that a person with common authority over an automobile may consent to the search, even if another person with common authority objects to the same).

Arguably, a seizure by consent is presumptively reasonable because "the consent acknowledges the individual's right to be free from interference and vitiates the intrusiveness of the action." Woodrum, 202 F.3d at 11 (citing Florida v. Jimeno, 500 U.S. 248, 250-51 (1991)). Here, however, the seizure is authorized by a third party, rather than each of the individuals subject to the seizure. Therefore, we analyze the reasonableness of a seizure conducted pursuant to third party consent, and determine whether that consent justifies the stop.

Hernandez maintains that, despite VTC's consent, absent a warrant or reasonable suspicion of criminal activity, the Border Patrol's seizure was unconstitutional because the bus was stopped by agents, rather than stopped for another purpose. Like the district court, we do not accept this argument. By purchasing a

10

bus ticket from VTC and boarding its bus, Hernandez relinquished to VTC a substantial amount of control over his movement. Although the ticket gave Hernandez some expectations regarding the bus's movement — namely that it would transport him from Brownsville to Houston — VTC retained control over what route the bus would take, the speed the bus would travel, and when and where and for how long the bus would stop along the way. Specifically, the evidence shows that VTC retained the right to stop en route and pick up any passenger who flagged down a bus.

In this respect, Hernandez is in a much different position than the taxicab passenger in Woodrum. That passenger, the United States Court of Appeals for the First Circuit noted, had "contracted to pay for both the right to exclude others from the cab and the right to control its destination in certain respects" and thus had "a reasonable expectation that he [would] not gratuitously be seized while en route." Woodrum, 202 F.3d at 6.[3] Hernandez could neither exclude others nor direct that the bus driver take a particular route. He could not order that the bus continue moving toward its destination despite a driver-

---

[3] In a case presenting somewhat similar facts as Hernandez's, the Ninth Circuit determined that the boarding of a bus by a border patrol agent while the bus was stopped at a red light implicated no constitutional rights of the appellant. See United States v. Gonzales, 979 F.2d 711, 712-13 (9th Cir. 1992). The primary differences between the facts of the Gonzales case and those of the case before us are that in Gonzales, the bus was already stopped when the agents boarded, and the agents questioned passengers while the bus continued on its route. See Gonzales, 979 F.2d at 713.

11

determined reason to stop.  At the minimum, given that a VTC bus may make any number of stops to pick up passengers, it is reasonable to conclude that Hernandez assumed the risk that the bus would make unplanned stops, as well as the risk that during these stops the bus might be boarded by Border Patrol agents.

Under these circumstances, the intrusion on Hernandez's Fourth Amendment interests effectuated by the Border Patrol's stop of VTC buses is quite limited.  As we have noted, Hernandez could expect numerous stops while en route.  Frequent stops would moderate any element of "fear and surprise," Sitz, 496 U.S. at 452, associated with any particular cessation of forward movement.  Uncontradicted evidence indicates that the Border Patrol's stops rarely exceed ten to fifteen minutes in length. Furthermore, the stops and inspections consist of little more than each passenger being asked some brief questions about his citizenship and, perhaps, being asked to show proof of citizenship.  All in all, the stop and immigration inspection is no more than a minor intrusion upon an individual passenger's liberty.  Cf. Sitz, 496 U.S. at 451 (characterizing the intrusion visited upon motorists forced to stop at a randomly placed, temporary sobriety checkpoint was slight); Martinez-Fuerte, 428 U.S. at 560 (holding that, in the context of immigration inspections conducted at a permanent Border Patrol checkpoint, the "objective intrusion" caused by a brief inquiry into a person's citizenship is minimal).

Compared to the limited intrusion on Fourth Amendment interests, the public concerns served by the stop are weighty. Testimony in the district court indicated that VTC voluntarily consented to random stops and immigration inspections by the Border Patrol and that the company considered such stops beneficial. Rios testified that, given VTC's willingness to pick up passengers on the side of the road, the company has little ability to monitor who is riding its buses and what they might be carrying on board. His testimony indicated that VTC feels that random stops of its buses by the Border Patrol help ensure the passengers' and driver's safety, and help prevent passengers from using VTC buses to transport contraband. Therefore, the consented-to stops provide a certain benefit to the public by helping ensure the safety of passengers on VTC buses.

The stops also serve the public interest by helping law enforcement agencies enforce immigration laws. Agent Atanacio testified that, in stops and inspections such as the one at issue here, he discovered illegal aliens on board the bus seventy-five percent of the time. Given the relative likelihood of discovering illegal aliens during these stops and inspections, the stops additionally weigh in favor of the public interest by aiding the Border Patrol in enforcement of the law.

Further supporting the reasonableness of the stops is the fact that VTC's consent does not give the Border Patrol unfettered discretion. Rather, the consent limits the Border

13

Patrol to stopping VTC buses en route in order to conduct immigration inspections. As such, VTC's consent is narrow in scope and purpose. While it is true that, in this instance, the inspection revealed more than the presence of illegal aliens, this does not detract from the limited nature and purpose of the original stop. Cf. Florida v. Jimeno, 500 U.S. 248, 257 (1991) (holding that "[t]he scope of a search is generally defined by its expressed object").

In light of VTC's voluntary consent, and considering the public benefits of the stop as opposed to the intrusion upon the rights of the individual bus passenger, the balance tips in favor of finding the stop reasonable. As a result, we hold that when a commercial bus company having a policy of making random, unplanned stops to pick up passengers consents to random stops and immigration inspections of its buses by the Border Patrol, a stop conducted in accordance with that consent does not violate the bus passengers' Fourth Amendment rights. In this case, there is no evidence that the agreement between VTC and the Border Patrol was not voluntary, or that the scope of this stop and inspection went beyond the type of stop agreed to by VTC. As such, Hernandez's Fourth Amendment right to be free from unreasonable seizures was not violated when the Border Patrol stopped the bus.

Our holding today is supported by the First Circuit's recent decision in Woodrum. At issue in Woodrum was Boston's Taxi

14

Inspection Program for Safety ("TIPS"), an effort by that city's police department and taxicab companies to prevent crimes against taxi drivers. Participation in TIPS is voluntary, and taxicab companies choosing to participate consent to stops of their taxis by police officers for the purpose of checking on the driver's safety. Because participation in the program is voluntary, and the scope and purpose of the stops limited, the First Circuit held that the stops did not violate a taxicab passenger's Fourth Amendment rights. See Woodrum, 202 F.3d at 12. Hernandez could not have had a greater expectation of privacy than Woodrum, a single passenger in a taxicab. Hernandez clearly did not have the degree of control over the movement of the bus on which he was riding that Woodrum had over the taxicab he had hired.

## III.

Because Hernandez's Fourth Amendment rights were not violated when his bus was stopped by the Border Patrol, the cocaine was properly admissible and the district court did not err in denying Hernandez's motion to suppress. AFFIRMED.

15