| ^CARTER, Chief Judge.
The defendant, Atania Castillo, was charged by bill of information, along with two other defendants, as principals to the crimes of possession with intent to distribute cocaine and possession of cocaine in excess of 400 grams, violations of La.R.S. 40:967A, La.R.S. 40:967F(l)(c) and La.R.S. 14:24.[2] The defendants moved for the evidence against them to be suppressed. Their motions were denied by the trial court after an evidentiary hearing. The defendants sought writs to this court, which were denied on September 12, 2000.[3] Writs were then taken to the Louisiana Supreme Court, but the defendants’ appli *395 cation was not considered because it was untimely.[4]
The defendants subsequently entered into Crosby[5] plea agreements. Each pled guilty as charged to possession with intent to distribute cocaine, reserving the right to appeal the district court’s denial of her motion to suppress. Pursuant to this agreement, the other charge against each defendant was dismissed, and each defendant was sentenced to ten years imprisonment at hard labor, the first five years to be without benefit of parole, probation or suspension of sentence.
The defendant, Atania Castillo, now appeals urging as the single assignment of error[6] that the district court erred in denying the motion to suppress the evidence.
I «FACTS
On June 19, 1999, United States Border Patrol Agent Anthony Crowell, in a vehicle parked perpendicular to Interstate 12(1— 12), was monitoring the eastbound lanes of the interstate in an area immediately beyond the Interstate 10 and 1-12 split in Baton Rouge. Agent Crowell routinely stopped certain commercial buses at this location as part of his job of locating and apprehending undocumented or “illegal” aliens. Shortly after midnight, Agent Cro-well stopped an El Expreso bus, which was traveling eastbound on 1-12. As was his routine, he stepped into the bus, chatted briefly with the bus driver, and then spoke in English and Spanish to the passengers, asking them to show him their immigration documents. He then walked briskly down the aisle, checking the documents. The three defendants, who were passengers on the bus, showed him valid 1-551 forms identifying them as resident aliens and citizens of the Dominican Republic.
Corporal David Grünewald of the East Baton Rouge Parish Sheriffs Office, who frequently parks his vehicle in the same area as Crowell and checks the luggage compartments for narcotics on buses pulled over by Agent Crowell, received a telephone call from Hans Mifel from the “HIDTA Task Force” in Houston, Texas.[7] Mifel informed him that three females transporting narcotics would be on a specific El Expreso bus that night. Grüne-wald had received reliable information of this nature from Mifel on previous occasions. Mifel told Grünewald the names of the three women, their seat numbers and ticket numbers, and he described one piece of their luggage as a green and black book sack.
Grünewald did not convey these details to Crowell, but did mention to him that there were possibly going to be some narcotics on one of the buses coming through that night. Crowell testified at the hearing on the motion to suppress the evidence that his concern was not with narcotics, but with finding and deporting illegal aliens. He further testified that he did not mind having Grünewald present when he routinely stopped buses. Sometimes Grü-newald was present, and sometimes he *396 could not be present due to traffic patrol duties.
|4On this occasion, Grünewald was present and, after Crowell stopped the bus, Grünewald asked for and received the consent of the bus driver to open the luggage compartment on the outside of the bus for a search for narcotics with his drug dog. The dog alerted on two pieces of luggage, one of which was a green and black book sack. There was a name tag on this item with the name “Josefa Perez,” which was one of the three names given to Grünewald by Mifel. Grünewald then boarded the bus, asking for the owner of the book sack.
Inside the bus, Crowell was speaking with a woman who was carrying a ticket in view, on which appeared the name, “Josefa Perez.” Her passport correctly showed her name to be Atania Castillo, the defendant herein. She appeared very nervous, with her arms crossed, rocking back and forth, and she smelled strongly of axle grease. She consented to a search of the book sack, in which were found two kilo-type packages wrapped in cellophane and covered in axle grease. Grünewald also observed the shapes of similar packages around her waist, underneath her clothes.
Grünewald then got off the bus. From outside, he observed a female, who had been sitting immediately behind Atania Castillo, stand up and remove square packages from her pants. The officer boarded the bus again and approached this woman to question her. He observed, on the floorboard of the bus, in close proximity to the woman, a kilo-type package that matched the packages found in Atania Castillo’s book sack. She had an El Ex-preso ticket that bore the name “Isabel Castillo,” one of the names provided by Mifel. Her name, according to her identification, was Rufina Cedano.
Grünewald asked for the passenger who owned the other piece of luggage alerted upon by the dog. No one claimed it. There was a passenger who very much resembled Rufina Cedano. She was wearing the same type of very bulky clothing, and she was crying. The officer could see packages under her clothing as she moved. Her identification showed her to be Ernes-tina Cedeno. Her bus ticket was in the name of “Maria Lopez,” another name that had been provided by Mifel.
Ijrhe three women were arrested. Two of the packages were field-tested that evening, testing positive for cocaine. The amount of cocaine being transported by the three women totaled approximately 19.4 kilograms.
ISSUES OF LAW
There are no factual findings in dispute before us for review. Rather, the defendant raises two issues of law, as follows:
1) Whether the border patrol agent had the right under statute or case law to stop the El Expreso bus on June 19, 1999.
2) Whether Deputy Grünewald violated the defendant’s constitutional rights in searching the bus with a drug-detection dog.
ISSUE ONE
The defendant contends that the stop of the bus for the purpose of checking for illegal aliens violated her Fourth Amendment right to be free of illegal searches and seizures. She points out that the bus was stopped at a location that is over 500 miles from the Mexican border and argues that Crowell did not have specific articula-ble facts to support his actions under United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
Section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1), authorizes any officer or employee of the *397 Immigration and Naturalization Service, without a warrant, “to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States.” The statute is silent as to any geographic limitation in which the interrogation may be conducted. Pursuant to Section 287(a)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(3), agents are authorized “within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance or vehicle.” “Reasonable distance” is defined in 8 C.F.R. § 287.1 as “within 100 air miles from any external boundary of the United States....”
However, the Supreme Court of the United States in Brignoni-Ponce limited the exercise of the authority granted by § 287(a)(1) and § 287(a)(3) in holding that, except at the border and its functional equivalents, officers on roving patrol may stop vehicles |fionly if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. The court stated that any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a vehicle in the border area, such as:
(1) The characteristics of the area in which a vehicle is encountered;
(2) The proximity of the vehicle to the border;
(3) The usual traffic patterns on a particular road;
(4) The officer’s previous experience with alien traffic;
(5) Information about recent illegal border crossings in the area;
(6) The driver’s behavior, erratic driving or obvious attempts to evade officers;
(7) Aspects of the vehicle (for instance, certain station wagons are frequently used for transporting concealed aliens); and
(8) Whether the vehicle appears to be heavily loaded or has an extraordinary number of passengers or whether the officer observes persons trying to hide.
While the apparent ancestry of an occupant alone cannot justify a stop of the vehicle, an individual’s foreign appearance, as observed by trained officers, is one factor that can be considered along with the totality of factors. In all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. United States v. Brignoni-Ponce, 422 U.S. at 885, 95 S.Ct. at 2582.
Since “reasonable suspicion” is a fact-intensive test, each case must be examined from the “totality of the circumstances known to the agent, and the agent’s experience in evaluating such circumstances.” United States v. Villalobos, 161 F.3d 285, 288 (5th Cir.1998). Although reason to believe that the vehicle has come from the border is a vital element, the belief that the vehicle has crossed the border is not necessary if other factors constitute reasonable suspicion to stop the vehicle. United States v. Nichols, 142 F.3d 857, 865 (5th Cir.), cert. denied, 525 U.S. 1056, 119 S.Ct. 621, 142 L.Ed.2d 560 (1998).
If the agents do not base the stop on the vehicle’s proximity to the border, Brignoni-Ponce may still be satisfied if other articulable facts warrant reasonable suspicion. United States v. Inocencio, 40 F.3d 716, 722 (5th Cir.1994). The *398 _|¿Inocencio court considered factors such as the experience of the veteran officer who was familiar with the area and who had been involved in five narcotics seizures within a five-month period on a particular road. The court noted that it was certainly clear to the agent that this particular road, which was inaccessible to the public, was a main artery for drug and alien smuggling since it circumvented the two nearby border patrol checkpoints.
In United States v. Orozco, 191 F.3d 578, 581 (5th Cir.1999), cert. denied, 528 U.S. 1144, 120 S.Ct. 996, 145 L.Ed.2d 943 (2000), the court found a roving patrol stop, although it occurred some 200 to 300 miles from the border, to be supported by reasonable suspicion. The court concluded that, since the distance from the border was not a factor cutting in favor of reasonable suspicion, the remaining factors must be looked at “most carefully” to ensure that the stop complied with the requirements of the Fourth Amendment.
A summary of information taken from Agent Crowell’s testimony at the hearing on the motion to suppress and from his report (which was admitted in evidence), is as follows. He has been employed as a United States border patrol agent since 1988 and has been working in Baton Rouge since July 1998. El Expreso Bus Lines specializes in the transport of passengers from Mexico and other Central and South American countries. There are no Houston border patrol agents at the location where passengers commonly board El Expreso buses; thus there is no safeguard against illegal aliens traveling to other parts of the country from Houston, a city heavily populated with illegal aliens. Furthermore, there are no terminal stops made by El Expreso buses, which is beneficial to the smuggler or illegal alien who knows that the more established bus companies are frequently inspected by law enforcement at their respective stations. El Expreso buses make unplanned stops, as requested by individual passengers.
Agent Crowell has had a great deal of experience dealing with certain commercial buses that travel through Baton Rouge from Texas, transporting illegal aliens to significantly less monitored areas of the country. In addition to El Expreso buses, he routinely stops buses of other bus lines that carry a high number of illegal aliens, such as the Adame. The significant number of illegal aliens who travel this [¿route on these commercial bus lines is evidenced by the more than 1,800 apprehensions made between July 1998 and February 2000 by Agent Crowell and his partner. These apprehensions were made exclusively by stopping commercial buses, with El Expreso’s passengers comprising a substantial number of these apprehensions. Stops of these buses in Baton Rouge produce a relatively larger number of illegal aliens than do checkpoints in border states because illegal aliens typically take greater precautions to avoid arrest in border states.
Because the stop in the instant case took place at a location that is not within a “reasonable distance” from the Mexican border, we must review other factors as outlined in Brignoni-Ponce “most carefully” to determine that the stop was not in violation of the Fourth Amendment. We find that Agent Crowell had a reasonable suspicion to stop the El Expreso bus, supported by the circumstances surrounding this typical smuggling route, the number of illegal aliens regularly found on the El Expreso buses at this location, the regularity of finding these illegal aliens on El Expreso buses at this location, and the agent’s considerable experience as a border patrol agent in apprehending illegal aliens in these circumstances.
The defendant points out that, in the instant case, there are no “aspects of *399 the vehicle itself," such as the vehicle appearing to be heavily loaded, to justify Agent Crowell's suspicion. The bus did not exhibit traits common to vehicles used by illegal-alien smugglers. Because the vehicle in this case is a commercial bus, there are no aspects of the vehicle itself to support reasonable suspicion under Brignoni-Fonce. Nevertheless, we find that the facts in this case meet the Brignoni-Ponce test, We note two other cases involving commercial buses in which reasonable suspicion was found. In United States v. Gonzales, 979 F.2d 711, 712-713 (9th Cir.1992), the court held that the boarding of a bus by a border patrol agent while the bus was stopped at a red light implicated no constitutional rights of the defendant. In United States v. Hernandez-Zuniga, 215 F.3d 483, 486-487 (5th Cir.), cert. denied, 531 U.s. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000), a random stop of a commercial passenger bus pulled over as it was traveling on a highway was held to be reasonable.
•J~In both Gonzales and Hernandez-Zuniga, the bus companies had given consent to the border patrol to make these types of stops. The record is silent on this point in this case, but the bus driver consented to the stop. Crowell's uncontradicted testimony was that he knew this bus driver from previous stops and that .the driver fully cooperated with him. Crowell testi-fled that he chatted briefly with the bus driver upon boarding the bus, as he routinely does, in order to maintain a good rapport with the driver.
The Hernandez-Zuniga court reasoned that because the bus customarily made random, unplanned stops, the passengers had relinquished a substantial amount of control to the bus company, and thus the stop by the border patrol agent was no more than a minor intrusion upon the individual passenger's liberty. The court reasoned that the public interest, which was served by the enforcement of immigration laws, outweighed the limited intrusion on Fourth Amendment interests.
Similarly, in the instant case, the bus would at times make unplanned stops to drop off passengers, so that the passengers can be said to have relinquished a substantial amount of control to the bus driver. The intrusion posed by the stop by Crowell was slight, particularly considering Crowell's testimony that he always took care to avoid delaying the bus for very long so as to remain on good terms with the bus driver, and that Crowell's routine was to walk quickly down the aisle, with no weapon displayed, asking only to see documents. This minimal intrusion was outweighed by the public interest in enforcement of immigration laws.
ISSUE TWO
The defendant contends that Grunewald violated her Fourth Amendment right to be free from unreasonable searches in searching the luggage compartment of the bus with a drug detection dog. Furthermore, the defendant argues that Grunewald's working alongside Crowell was an attempt to circumvent the prohibitions of the Fourth Amendment, as Grunewald could not have demonstrated probable cause in order to obtain a search warrant and thus could not have stopped the bus on his own to search the luggage compartment.
 J~The bus driver consented to the opening and searching of the luggage compartment of the bus. A search conducted by consent is an exception to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-2044, 36 L.Ed.2d 854 (1973). Furthermore, exposure of unopened luggage to a trained narcotics-detection dog for sniffing purposes does not constitute a "search" under the Fourth Amendment. See United States v. Place, 462 U.S. 696, *400 706-707, 103 S.Ct. 2637, 2644-2645, 77 L.Ed.2d 110 (1983).
Once the bus was stopped by Cro-well for the legitimate purpose of checking for illegal aliens, Grunewald’s search of the luggage compartment, pursuant to the bus driver’s consent, was not a violation of the Fourth Amendment. Nothing in the record suggests that the pairing of the officers was designed to give Grünewald the same latitude as the border patrol agent regarding detentions and searches. Indeed, it is generally permissible for different law enforcement agencies to cooperate to ensure obedience to the law. See People v. Sanchez, 195 Cal.App.3d 42, 46, 240 Cal.Rptr. 413, 416 (4th Dist.1987). Therefore, we need not address whether reliance by Grünewald upon the information he obtained from Mifel could have supported a search warrant.
Accordingly, this assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.

. The defendants, Ernestina Cedeno and Rufi-na Cedano, were charged as principals, along with Atania Castillo, with these violations in the same bill of information. The three cases were consolidated for the purpose of an evi-dentiary hearing on their motions to suppress the evidence. Additionally, the three defendants appeared at the same time for a Boykin hearing and subsequent sentencing hearing, all as appears in District Court docket number 08-99-571. All three defendants have appealed. The three cases have each been allotted a different number in this Court. See 2001-KA-0569 and 2001-KA-0570. Three separate records were prepared for these appeals; however, the records are virtually identical.

.State v. Cedano, 2000-1686 (La.App. 1st Cir. 9/12/00) (unpublished).

. State v. Cedano, 2000-2851 (La.12/8/00), 775 So.2d 1075.

. State v. Crosby, 338 So.2d 584 (La.1976).

. This appeal is similar to the matter of State v. Vega, 2001-KA-0637, which is also pending before this Court. However, the incident in the instant matter occurred on a different date than the incident in State v. Vega, and it involved additional facts not present in the Vega appeal. The basic issue of the authority of a border patrol agent to stop buses of certain bus lines known to harbor illegal aliens is common in the Vega appeal and in the appeals of the three defendants including the instant matter.

.The record does not provide a more specific identification of Mifel.