[Cite as *State v. Andrews*, 2017-Ohio-1383.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2016-CA-13 |
| | : | |
| v. | : | T.C. NO. TRC1509207 |
| | : | |
| ARTIS ANDREWS, III | : | (Criminal Appeal from |
| | : |  Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___14th___ day of _____April_____, 2017.

. . . . . . . . . .

BETSY A. DEEDS, Atty. Reg. No. 0076747, 510 West Main Street, Fairborn, Ohio 45324
        Attorney for Plaintiff-Appellee

KIRIAKOS KORDALIS, Atty. Reg. No. 0089697, 130 W. Second Street, Suite 1818, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Artis Andrews, III. Andrews appeals from his judgment entry of conviction, following a plea of no contest, to one charge of operating a vehicle under the influence of alcohol, in violation of R.C. 4511.19(A)(1)(a), his third such offense.  Three remaining charges were dropped in

exchange for his plea, namely driving under a twelve-point suspension, in violation of R.C. 4510.037(J), a marked lanes violation, in violation of R.C. 4511.33, and refusing to submit to a chemical test, in violation of R.C. 4511.19(A)(2). Andrews' judgment entry of conviction provides that he "is sentenced to 365 days of jail, no good time, credit for 2 days, suspend 245 days with the remaining 118 days to be served in the Greene County Jail, specifically in the 90 day Greene Leaf Therapeutic Community and any aftercare programs recommended." The Entry provides that the court "takes judicial notice that Defendant has voluntarily agreed to enter the Greene Leaf program. * * * Any violation of this Order will result in Defendant's incarceration at the Greene County Jail, general population." This Court suspended Andrews' sentence pending his appeal.

{¶ 2} Andrews was stopped and cited on October 12, 2015, at approximately 1:08 am. He pled not guilty on October 13, 2015, and on December 18, 2015, Andrews filed a Motion to Suppress, challenging the validity of his traffic stop and detention, the administration of field sobriety tests, the existence of probable cause for arrest, and the advisement of his *Miranda* rights.

{¶ 3} At the hearing on the motion, Paige Miranda testified that she has been employed by the State Highway Patrol since 2012. She stated that she has been trained to detect whether an individual is under the influence of alcohol or drugs of abuse, and that pursuant to the National Highway Traffic and Safety Administration Manual ("NHTSA"), she is trained and certified to administer field sobriety tests, namely the "HGN test," the "one-legged stand test," and the "walk-and-turn test." Miranda stated that she works five nights a week and that at "least once a night" she comes into contact with someone under the influence of alcohol. She stated that "[r]ed glassy eyes, the odor of

alcoholic beverage," slurred speech and fumbling with papers in her experience suggest that a person may be impaired.

{¶ 4} Miranda stated that on October 12, 2015, she was patrolling the roads of Greene County in her cruiser and in uniform when she observed Andrews "travelling fast on Grange Hall." Miranda stated that she is trained in the visual estimation of speed. She stated that the posted speed limit there is 35 miles per hour, and that when she turned around to pursue Andrews, she had to "catch up" to his vehicle. She stated that she "didn't have a significant distance to track - - pace his speed." According to Miranda, she observed Andrews stop at the light on Grange Hall Road at Pentagon Boulevard, and "after he traveled passed [sic] that light he went outside of his lane on the right-hand side." She testified that Andrews "went out the right side about half a tire width." She stated that there was nothing in the roadway that made it impossible for him to stay in his lane, although she stated that there was a "slight bump within the roadway."

{¶ 5} Miranda testified that she "activated my pursuit lights to stop the vehicle. He continued northbound on Grange Hall and he turned left onto Colonel Glenn," stopping "on the right-hand side of Colonel Glenn." She stated that she approached the driver's side of the vehicle and "told him why I stopped him and he said that he didn't travel outside of his lane." She stated that Andrews' girlfriend was in the car with him in the front passenger seat.

{¶ 6} Miranda testified, "I asked him for his license, he was kind of going through his pockets looking for his license, he said he didn't have one, so I asked him to exit the vehicle." Miranda testified that while Andrews told her that "he had an ID, he didn't show me an ID." Miranda testified that when Andrews exited his vehicle, she detected a strong

odor of alcohol, and that he "had red, glassy eyes." Once inside her cruiser, Miranda stated that Andrews orally advised her of his Social Security Number. She testified that she continued to smell a "strong" odor of alcohol coming from Andrews. According to Miranda, while Andrews initially told her, while in his vehicle, that he was travelling from the Kings Table Bar, once in her cruiser, he told her that he was coming from the Kevin Hart Comedy Club. Miranda testified that she asked Andrews "how much alcohol he had consumed, he never gave an exact answer, he kind of dodged my question, I had to ask him several times." She stated that she entered his Social Security Number into her computer and learned that his license was suspended. Miranda testified that she "asked him who the vehicle came back to because he was driving with a suspended license." She stated that Andrews "acted at first as if he didn't know who the registered owner was; through conversation I finally got it out of him who the owner was and then I confirmed it with the front passenger." Miranda stated that the owner of the vehicle was the grandfather of Andrews' girlfriend.

{¶ 7} Miranda testified that she asked Andrews to perform field sobriety tests, and that he agreed to do so. She stated that he was argumentative throughout the tests, and that he "would interrupt me and not let me explain how to do them." She stated that she asked Andrews, because of his tall height relative to hers, to sit on a nearby brick wall for the horizontal gaze nystagmus test ("HGN"). According to Miranda, when she asked Andrews to sit on the wall, "he fell back, he caught himself," and he "did have balance troubles." At this time, Miranda testified that she continued to smell a strong odor of alcohol emanating from Andrews and to observe his red, bloodshot eyes. She stated that she conducted the HGN test in accordance with the NHTSA training she received,

and that in the course thereof she looked for nystagmus, or involuntary jerking of the eyes. She stated that she specifically looked for six clues of intoxication, namely lack of smooth pursuit, distinct nystagmus at maximum deviation, and onset of nystagmus prior to forty-five degrees in each eye. Miranda stated that she observed all six clues in the course of the test. According to Miranda, the presence of four clues results in failure of the test.

{¶ 8} Miranda stated that she also conducted a vertical gaze nystagmus test, which indicates "approximately how much alcohol someone has consumed." She stated that "if they have consumed a lot of alcohol they're going to get vertical nystagmus." Miranda testified that she observed vertical nystagmus in both of Andrews' eyes.

{¶ 9} Miranda stated that she next asked Andrews to perform the walk-and-turn test, and that she looked for eight clues of intoxication in the course of the test consistent with her NHTSA training. She stated that Andrews exhibited six clues, namely that he began the test before she completed the instructions, moved his feet to maintain balance during the instructions, raised his arms approximately six inches, stepped off the line while walking, turned incorrectly, and stopped walking to steady himself. Miranda stated that the presence of two clues results in failure of the test.

{¶ 10} Miranda testified that she next administered, consistent with her NHTSA training, the one-leg stand test, looking for four clues of intoxication. She stated that Andrews exhibit three clues by raising his arms approximately six inches, swaying while balancing, and putting his foot down. Miranda stated that the presence of two clues results in failure of the test.

{¶ 11} Miranda testified that following the administration of the three tests, she arrested Andrews for OVI and placed him in her cruiser after conducting a pat down

search. She stated that at that time she advised him of his *Miranda* rights. Miranda stated that she based her decision to arrest Andrews on the "totality of the circumstances," including Andrews' "driving, the strong odor of alcohol, the red glassy eyes, the field sobriety tests." When asked if any further observations contributed to her decision, Miranda replied, "Yes. When I got out of the vehicle to talk to the passenger, the defendant called me a f*****g b****." She acknowledged that in her narrative report she indicated that Andrews' emotions were high and low, and she testified that Andrews "would be okay at one point, cooperative, and then he would have an attitude with me."

{¶ 12} On cross-examination, Miranda stated that she and Andrews were travelling in opposite directions when she initially observed him, and that he "appeared to be traveling above the posted speed limit." She stated that she turned around to pursue him, catching up to him before the red light. She stated that he went outside of the lane by half a tire width to the right from the left lane. Miranda stated that she did not observe Andrews weaving. After she activated her lights, Miranda stated that Andrews "waited until the last minute to make a left turn onto Colonel Glenn." She stated Andrews made a normal turn.

{¶ 13} Defense counsel played a video of the traffic stop recorded from the camera in Miranda's cruiser. Miranda stated that the video commenced after she observed him and believed him to be speeding. In the course of viewing the video, the following exchange occurred:

> Q.   * * *
>
> Now, we just watched the cruiser video of him allegedly leaving his
>
> lane of travel.   On the video it looked like he touched the lane, the indicator

lane, the white lane on the ground, he never went over from what the video showed, yes or no?

A. You're asking me?

Q. Yes.

A. He went - -

Q. From what we just saw - -

A. - - over half a tire width, approximately half a tire width.

Q. Okay.

A. Outside of the dotted white line.

Q. Outside of the dotted white line?

A. Correct.

Q. Okay. To me, on the video it looked like he touched the line only.

MS. DEEDS: I'm going to object. The - - the trooper can't testify to what Mr. Kordalis saw or didn't see on the video.

* * *

COURT: Objection sustained.

{¶ 14} Miranda acknowledged that she did not include in her narrative report her belief that Andrews was speeding when she initially observed him. She testified that she "didn't pace him at a - - an exact speed so I didn't put it in there." Miranda stated that she did not believe the slight bump in the road caused Andrews to leave his lane of travel. When asked to describe Andrews' demeanor when she initially approached his vehicle, Miranda stated that Andrews was "calm." When asked if she could discern whether the

odor of alcoholic beverage she detected was coming from Andrews or his passenger, Miranda responded, "When I'm talking to him I can smell it coming from his breath."

**{¶ 15}** Miranda stated that she asked Andrews to exit his vehicle when he could not produce identification, and that she detained him to verify his identity. She stated that she placed him in the back of her cruiser. Miranda stated that Andrews did not exhibit slurred speech. The following exchange occurred:

Q. * * * So he is in the back of your car - - the back of your cruiser,

did you ask him if he had anything to drink?

A. I did.

Q. And what was his response?

A. He said he was cool.

Q. He was cool?

A. Uh-huh.

Q. Did he ever state that he never had anything to drink?

A. I don't recall exactly how many times I asked him, but at the end

the last time I asked him I said are you saying that you don't - - you haven't

consumed any alcohol - -

Q. Uh-huh.

A. - - and he said yes.

Q. Okay.

A. He didn't directly tell me I haven't consumed any alcohol, he just

kind of dodged the question each time.

* * *

Q.  * * * Did he indicate that he had already gone through this, and by that I mean, that he was under suspension for a possible OVI?

A.  He said he had served jail time.

{¶ 16} Miranda stated that Andrews' passenger advised her that she had been drinking.  She testified that she had Andrews sit on the wall to conduct the HGN test because "we just need to make sure that we were twelve to fifteen inches away and slightly above eye level" to properly conduct the test.  She stated that she used a pen as the stimulus for the test, and that it was 12 to 15 inches from Andrews' face.  She stated that in the course of the test, "you're going to take their eye to where you can't see the white anymore," and that there is a time limit of "no less than four seconds, no more than thirty."  When asked whether the horizontal or vertical gaze nystagmus test is more accurate, Miranda responded, pursuant to her training manual, "You have to do them all together * * * for it to be a completed test."

{¶ 17} Miranda stated that when she placed Andrews in her cruiser, he was detained and not free to go.  She stated that she asked him a few questions about where he was going and coming from, and that she did not believe that such questions would elicit an incriminating response.

{¶ 18} On redirect examination, the following exchange occurred:

Q. * * *

Is there a definitive turn lane to make a left onto Colonel Glenn?

A.  Yes.

Q.  * * *  Did the defendant make his left turn by getting into the turn lane when it was appropriate to get into the turn lane?

A. No.

Q. * * * Did he cross over that solid white line to move over into the turn lane at the last second?

A. Yes.

Q. * * * So he crossed that line?

A. Yes.

Q * * * Trooper Miranda, have you had the occasion to ever go back and watch any of your videos after you've conducted stops?

A. Yes.

Q. * * * Do you - - is it common for you to remember things that aren't clear on the video, remember things that you saw with your own eyes that maybe don't come out as well on the video?

A. Yes.

{¶ 19} Miranda stated that when she initially placed Andrews in her cruiser, he was not in handcuffs and that she did not tell him he was under arrest at that time. On re-cross-examination, she stated that approximately half a tire width went outside of the dotted white line, so that half of the tire was in the middle of the dotted line and the other half was to the right of the line.

{¶ 20} At the conclusion of the hearing, in instructing the parties to file post-hearing briefs, the court indicated, " * * * the two issues, though, that I would request that you concentrate on would be the one about marked lanes; two, would be whether that was considered custody when defendant was placed inside the vehicle for identification purposes."

**{¶ 21}** Andrews filed his post-hearing memorandum on February 19, 2016. He argued therein that Miranda lacked a reasonable articulable suspicion that he committed a marked lanes violation. Andrews asserted as follows:

The Defense would assert that the best evidence as to whether a marked lane violation occurred on the early morning of October 12, 2015 is the cruiser video. The video is clear and objective. At 1:08:30, it is clear on the video that the Defendant does touch the dotted white line, yet does not cross the dotted white line to the right. It is also clear on the video that the Defendant did hit a bump in the road that made the vehicle shift and touch the dotted white line.

**{¶ 22}** Andrews directed the court's attention to *State v. Marcum*, 2013-Ohio-2652, 993 N.E.2d 1289 (5th Dist.). He argued that the "case law on when a marked lane violation has occurred seems to indicate that an individual must _completely_ cross over the dividing line on the road" to violate R.C. 4511.33. He argued that "various appellate districts * * * have come to the conclusion that driving on a marked lane is not a violation of R.C. 4511.33." Andrews argued that the video reflects that he "at best touches the dotted line and does not go over half a tire width as Trooper Miranda indicated."

**{¶ 23}** Citing *State v. Schwieterman*, 2d Dist. Darke No. 1588, 2003-Ohio-615, and *State v. Shaffer*, 2013-Ohio-3581, 4 N.E.3d 400 (3d Dist.), Andrews argued that he "was driving his vehicle as nearly as practicable." He asserted that in *Schwieterman,* this Court "made it clear that they believed that the legislature did not want motorists to be punished when road debris interfered with the motorist[']s ability to stay in the lane." Andrews argued that in *Shaffer*, "the court reasoned that 'as nearly as practicable'

inherently contemplates some inevitable touching of the lane during routine driving, especially when encountering imperfections in the roadway, and that such incidents do not constitute a marked lane violation." He cited Miranda's testimony that Andrews hit a bump in the road, which he asserts is reflected in the video. Andrews argued that he did not commit a marked lane violation, and that such a conclusion is supported by Miranda's testimony and the video. As a result, he argued, Miranda lacked reasonable articulable suspicion for the stop, rendering all evidence obtained subject to suppression.

{¶ 24} Andrews further asserted that Miranda lacked a sufficient basis to request that he submit to the field sobriety tests. He cited *State v. Spillers*, 2d Dist. Darke No. 1504, 2000 WL 299550 (March 24, 2000), and asserted that this Court "held that an officer did not have reasonable and articulable suspicion of a DUI violation that would justify the administration for FSTs." He argued that therein, an officer observed "three or four marked lane violations, which the court found to be de minimis, a slight odor of alcohol, and Spillers' admission that he had consumed a 'couple of beers.' " Andrews further cited *State v. Dixon,* 2d Dist. Greene No. 2000-CA-30, 2000 WL 1760664 (Dec. 1, 2000), asserting that therein this Court "concluded that the officer's observations that the Defendant had glassy, bloodshot eyes, an odor of alcohol and an admission of consuming one or two beers was not enough to intrude upon 'one's liberty.' " Andrews noted Miranda's testimony that she did not observe him weaving and that she did not indicate that he committed any other violations. Andrews asserted that the video demonstrates that he exited his vehicle when asked to do so without bracing himself and without difficulty, and that he walked to the cruiser without stumbling. He asserted that it "is clear from the video's audio that the Defendant was not slurring his speech and was responsive

to all of the Trooper's questions." According to Andrews, while in the cruiser, he advised Miranda that he had not been drinking and that he was driving his passenger home because she had been doing so, which the passenger corroborated.

{¶ 25} Andrews argued that statements were obtained from him in violation of his rights. He argued that "prior to having the Defendant sit in the back of her cruiser, the Trooper at a minimum knew that she would most likely be arresting the Defendant for driving under suspension." He asserted that "when determining what a reasonable person in the Defendant's situation would have felt, it must be done through the prism of an individual who is under suspension." Andrews asserted that he, "while in the back of the cruiser, had to of [sic] thought that he was in custody and that he would not be released that evening solely because of the fact that he did not possess a valid drivers [sic] license. Therefore, the custodial branch of *Miranda* would be satisfied."

{¶ 26} Finally, Andrews asserted that the "interrogation portion of *Miranda* would also be satisfied." He argued that Miranda "stated at the hearing that while the Defendant was in the back of the cruiser that she did ask him questions," which the video verified. According to Andrews, since she knew that he did not have a valid license, Miranda "had a good idea that the Defendant would at least be cited for a driving under suspension charge. The Trooper at that time should have read the Defendant his *Miranda Rights* prior to questioning him about his whereabouts that evening."

{¶ 27} The State filed its opposing memorandum on February 26, 2016. The State asserted that Andrews' traffic stop was proper, noting that Miranda testified that she observed the violation, and that in addition, as Andrews "traveled he made a late lane change into the turn lane to turn left onto Colonel Glenn Highway, again clearly traveling

over the solid line dividing the through lane from the turn lane." The State directed the court's attention to *State v. McEldowney*, 2d Dist. Clark No. 06-CA-138, 2007-Ohio-6690. According to the State, the *McEldowney* Court "conducted an extensive analysis regarding whether a marked lane violation may be the basis for a traffic stop. Within the analysis, the Court referred to the Ohio Supreme Court's decision in *State v. Batchili* [,113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282], finding that a single center lane marker violation by only about a tire's width was a lawful basis for a traffic stop." Andrews argued that the Second District "decided to follow the Supreme Court's lead and follows the existing district precedent."

{¶ 28} The State asserted that although the violation may be difficult to observe on the video, Miranda "consistently testified that Defendant's right tire crossed over the center dividing line by half a tire's width." The State noted that Miranda's "cruiser is not equipped with high definition recording equipment." The State argued that "video recordings vary in quality and are certainly not the same as a trained Ohio State Highway Patrol Trooper viewing the events as they occurred directly in front of her." The State argued that Miranda's testimony was further consistent over "a lengthy and repeated cross examination," and that Andrews "committed a second marked lanes violation that is crystal clear on the video when he drove over the solid white line dividing the through traffic lane from the turn lane."

{¶ 29} Finally, the State argued that Andrews "was not in custody for the purposes of the *Miranda* protections," and that "*Miranda* does not apply to *Terry* detentions." According to the State, after Andrews failed to produce identification, he was placed in Miranda's cruiser, and "[t]his intrusion was brief, Defendant was not handcuffed, nor was

he told he was under arrest."

{¶ 30} In overruling Andrews' motion to suppress, the court determined as follows:

> The Court finds that Defendant had reasonable and articulable suspicion to stop Defendant for a marked lanes violation. It is well settled that where an officer has an articulable reasonable suspicion to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid. * * * In the case *sub judice*, prior to the stop, Trooper Miranda observed the vehicle being driven by Defendant travel over the white dashed line by one-half tire width. Defendant argues that the video of the stop indicates that the vehicle did not go over the line. He further argues that if the tire did go over the line that it was due to a bump in the road. The Court has also reviewed the video and notes that it is of low quality. As a result, the Court cannot discern from the video how far over the line the tire travelled. Therefore, the Court relies on the testimony of Trooper Miranda who was credible in her testimony that the tire travelled over the line by one-half tire width and makes the finding that the vehicle did travel by one-half tire width into the adjacent lane. The Court further finds that any bump in the road did not impede the ability to maintain the vehicle within its lane of travel. In making this finding, the Court notes that it relies on the testimony of Trooper Miranda who was credible in this regard. No contradicting evidence was presented. Therefore, the trooper had reasonable and articulable suspicion to stop the vehicle.

The Court further finds that the trooper had reasonable and articulable suspicion to detain the Defendant for OVI. Upon approaching the Defendant's vehicle the trooper observed that the Defendant's eyes were red and glassy and detected a strong odor of an alcoholic beverage. She further knew that the vehicle had travelled over the line by one-half of a tire width. Although the basis for the stop was de minimis, the totality of these observations rise to the level of reasonable and articulable suspicion to detain Defendant and request him to exit the vehicle in order to determine the source of the odor since Defendant did have a passenger in the vehicle with him.

The Court finds that no Miranda violation occurred as Defendant was not in custody when the trooper initially placed Defendant inside the cruiser and no evidence of any interrogation was presented after Defendant was advised of his arrest and of his Miranda rights. At issue is whether Defendant was in custody at the time when he was placed inside the cruiser while the trooper verified his identity which would require the trooper to advise Defendant of his Miranda rights. The Court finds that an officer may arrest a person charged with a minor misdemeanor if the person cannot or will not offer sufficient evidence of his or her identity. * * * Therefore, it was not unreasonable for the officer to request Defendant to sit inside her cruiser while she verified his identity since he did not produce any state issued identification, but rather only an oral representation of his identity. This detention to identify the Defendant does not amount to a full custodial arrest

which would trigger Miranda.

The Court finds that the trooper administered the field sobriety tests in substantial compliance with her training and with NHTSA. The Court notes that the Motion to Suppress argued lack of substantial compliance in general terms. As such, the State must only present evidence in general terms that it substantially complied with the regulations.

Lastly, the Court finds that Trooper Miranda had probable cause to arrest the Defendant for an OVI. Probable cause exists when the arresting officer has knowledge of facts or circumstances that would warrant a reasonable, prudent person to believe that the person may have committed a crime. * * * At the time of the arrest for OVI the trooper knew that she had observed Defendant's vehicle travel into the adjacent lane of travel by one-half tire width, that the Defendant's eyes were red and glassy, that she detected a strong odor of an alcoholic beverage emitting from Defendant's vehicle which she continued to detect while Defendant was inside of her cruiser and outside, that Defendant was coming from a bar in the early morning hours, that Defendant had failed all of the field sobriety tests as well as her observations of him while he performed those tests, that Defendant had trouble maintaining his balance while sitting on the wall, and that Defendant's emotions fluctuated. Based on the totality of the circumstances, the Court finds that the trooper had probable cause to arrest Defendant for an OVI.

{¶ 31} Andrews asserts two assignments of error herein. His first assignment of

error is as follows:

> THE TRIAL COURT COMITTED REVERSIBLE ERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO SUPPRESS WHEN IT FOUND THAT TROOPER MIRANDA HAD REASONABLE ARTICULABLE SUSPICION TO BELIEVE THAT THE DEFENDANT HAD COMMITTED A MARKED LANES VIOLATION.

{¶ 32} Andrews argues that for "many years now police cars and interview rooms have been equipped with audio/video recording devices taking fact analysis essentially out of the equation." Citing *State v. Coleman*, 85 Ohio St.3d 129, 707 N.E.2d 476 (1999), Andrews asserts that an "authenticated tape is 'much more likely to be free from error than the words of a witness testifying from memory.' " He asserts that "herein we have the actual audio and video of the entire stop and arrest of the Defendant."

{¶ 33} Andrews directs our attention to *Schwieterman* and *Shaffer* and the analyses therein of R.C. 4511.33(A)(1). Andrews argues that he was "driving his vehicle as nearly as practicable as determined in the holdings of *Schwieterman* and *Shaffer*." Andrews argues that "the best evidence as to whether a marked lane violation occurred on the morning of October 12, 2015 is the cruiser video. The video is clear and objective. At 1:08:30, it is clear on the video that the Defendant does touch the dotted white line, yet does not cross the dotted white line to the right." According to Andrews, it is further "clear on the video that the Defendant did hit a bump in the road that made the vehicle shift and touch the dotted white line. This is evidenced by the fact that the automobile that Defendant was driving makes a substantial up and down movement after hitting the bump," which, Andrews asserts, is visible on the video.

**{¶ 34}** Andrews asserts that the matter herein is "strikingly similar" to *State v. Marcum*, 2013-Ohio-2652, 993 N.E.2d 1289 (5th Dist.), and he further cites *State v. Baker*, 6th Dist. Wood No. WD-13-074, 2014-Ohio-2564. Andrews asserts that "case law on when a marked lane violation has occurred seems to indicate that an individual must *completely* cross over the dividing line on the road." Andrews directs our attention to *State v. Franklin*, 5th Dist. Licking No. 11-CA-128, 2012-Ohio-3089, and *City of Mentor v. Phillips*, 11th Dist. Lake No. 99-L-119, 2001 WL 20736 (Dec. 29, 2000). He asserts that it "is also clear that the Supreme Court of Ohio has not ruled on whether driving *on* a marked lane is a violation of R.C. 4511.33. Nonetheless, various appellate districts have ruled on this issue here recently and have come to the conclusion that driving on a marked lane is not a violation of R.C. 4511.33." Finally, he asserts that "when all of the evidence is taken in totality, it is clear that on October 12, 2015 the Defendant did not make a marked lane violation as defined under R.C. 4511.33. The cruiser video supports this contention and the Trooper's testimony does as well."

**{¶ 35}** The State directs our attention to *McEldowney,* in which "the Court referred to the Ohio Supreme Court's decision in *State v. Batchili* finding that a single center lane marker violation by only about a tire's width was a lawful basis for a traffic stop." The State noted that the "*McEldowney* Court decided to follow the Supreme Court's lead and follow the existing district precedent."

**{¶ 36}** The State asserts that Andrews "claims that because the lane violation may be difficult to view on the video this court should completely discount Trooper Miranda's testimony. However, Trooper Miranda consistently testified that Defendant-Appellant crossed over the right hash mark by about half of a tire's width." The State asserts that

"[a]lthough this may be difficult to see on the video, please keep in mind that there was no testimony that the cruiser is equipped with high definition recording equipment." The State argues that "the trial court specifically noted in the March 21, 2016 Decision and Judgment Entry that the video is of poor quality and therefore relied upon Trooper Miranda's testimony in finding a marked lanes violation had occurred which provided the reasonable suspicion necessary for a proper traffic stop." The State asserts that the "trial court specifically found Trooper Miranda's testimony credible regarding the marked lanes violation."

{¶ 37} As this Court has previously noted:

In ruling on a motion to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 [ (1973) ]. Accordingly, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*; *State v. Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, ¶ 11.

*State* v. *Mobley*, 2d Dist. Montgomery No. 26044, 2014-Ohio-4410, ¶ 11.

{¶ 38} As noted by the Ohio Supreme Court in *State v. Mays,* 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8 ("Mays"):

The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *State v. Orr* (2001), 91 Ohio St.3d 389, 391, 745 N.E.2d 1036. The United States Supreme Court has stated that a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime. *Delaware v. Prouse* (1979), 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660; *Berkemer v. McCarty* (1984), 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317, quoting *United States v. Brignoni–Ponce* (1975), 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607. Further, "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044, at paragraph one of the syllabus.

Therefore, if an officer's decision to stop a motorist for a criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the circumstances, then the stop is constitutionally valid.

**{¶ 39}** In discussing reasonable suspicion, the *Mays* Court noted as follows:

"The Fourth Amendment imposes a reasonableness standard upon the exercise of discretion by government officials. *Delaware v. Prouse* (1979), 440 U.S. 648, 653–654, 99 S.Ct. 1391, 59 L.Ed.2d 660. 'Thus, the permissibility of a particular law enforcement practice is judged by balancing

its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' Id. at 654, 99 S.Ct. 1391, 59 L.Ed.2d 660. To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889." *State v. Batchili,* 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 11. "The 'reasonable and articulable suspicion' analysis is based on the collection of factors, not on the individual factors themselves." (Emphasis sic.) Id. at ¶ 19.

As the United States Supreme Court elaborated in *Berkemer v. McCarty*, a police officer who lacks probable cause but whose observations lead him reasonably to suspect that a particular person's behavior is criminal may detain the person briefly to investigate the circumstances that provoked the suspicion. 468 U.S. at 439, 104 S.Ct. 3138, 82 L.Ed.2d 317.

" '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' [*Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. 2574, 45 L.Ed.2d 607] (quoting *Terry v. Ohio*, supra, 392 U.S. [at 29, 88 S.Ct. 1868, 20 L.Ed.2d 889] ). Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then

be released." *Berkemer*, 468 U.S. at 439–440, 104 S.Ct. 3138, 82 L.Ed.2d 317. The opposite result is also true: if the detainee's answers provide the officer with probable cause to arrest him, then it is proper for the detainee to be arrested.

*Id.*, ¶ 12-14.

{¶ 40} R.C. 4511.33 provides:

(A) Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:

(1) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.

{¶ 41} In *Mays*, the Ohio Supreme Court accepted a certified conflict between *State v. Phillips*, 3d Dist. Logan No. 8-04-25, 2006-Ohio-6338, and *State v. Mays*, 5th Dist. Licking No. 2006-CA-00097, 2007-Ohio-2807. *Phillips* held that "R.C. 4511.33(A) imposes a two-prong test." *McEldowney*, ¶ 10. As this Court noted:

This test requires an officer "to witness (1) a motorist not driving his or her vehicle within a single lane or line [of] travel as nearly as is practicable; *and* (2) a motorist not first ascertaining that it is safe to move out of that lane or line [of] travel before doing so, in order to have probable cause to constitutionally stop the motorist. [*Phillips*,] at ¶ 65 (emphasis in

original).

*McEldowney, id.* The *Mays* Court agreed to resolve the following issue: " 'May a police officer who witnesses a motorist cross a right white edge line and without any further evidence of erratic driving or that the crossing was done in an unsafe manner make a constitutional stop of the motorist?' " *Mays*, 119 Ohio St.3d 406, ¶ 1.

{¶ 42} In *Mays*, an Ohio State Highway Patrol trooper observed the vehicle in front of him "drift across the white fog line by approximately one tire width. A few moments later, he observed the same thing: the vehicle drifted across the right fog line by approximately a tire width and then drifted back into the lane." *Mays*, ¶ 2. "The trooper continued following the vehicle for approximately one and a half miles, and he observed no further traffic violations. The trooper then signaled the driver to pull over the vehicle." *Id.* On appeal, Mays asserted that "his actions in this case – twice driving across the white edge line – are not enough to constitute a violation of R.C. 4511.33." *Id.,* ¶ 15. He further argued that "the stop was unjustified because there was no reason to suspect that he had failed to first ascertain that leaving the lane could be done safely or that he had not stayed within his lane 'as nearly as [was] practicable,' within the meaning of R.C. 4511.33(A)(1)." *Id.*, ¶ 17.

{¶ 43} The *Mays* Court initially determined that R.C. 4511.33 "requires a driver to drive a vehicle entirely within a single lane of traffic. When an officer observes a vehicle drifting back-and-forth across an edge line, the officer has a reasonable and articulable suspicion that the driver has violated R.C. 4511.33." *Id.*, ¶ 16. The Court further found that while "R.C. 4511.33 does provide for certain circumstances in which a driver can cross a lane line without violating the statute," the question, however, "of whether

appellant might have a possible defense to a charge of violating R.C. 4511.33 is irrelevant in our analysis of whether an officer has a reasonable and articulable suspicion to initiate a traffic stop." *Id.,* ¶ 17. The Court concluded that an "officer is not required to determine whether someone who has been observed committing a crime might have a legal defense to the charge."  *Id.*

{¶ 44} The *Mays* Court concluded as follows:

R.C. 4511.33(A)(1) provides that a driver must remain within the lane markings "as nearly as is practicable" and that a driver shall not move from a lane "until the driver has first ascertained that such movement can be made with safety." The phrase "as nearly as is practicable" does not give the driver the option to remain within the lane markings; rather, the phrase requires the driver to remain within the lane markings unless the driver cannot reasonably avoid straying.

We agree with the Seventh District Court of Appeals' explanation of R.C. 4511.33 in *State v. Hodge*, 147 Ohio App.3d 550, 2002-Ohio-3053, 771 N.E.2d 331. The Hodge court stated: "The legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane. Nor, we are quite certain, did the legislature intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal. We are equally certain the legislature did not intend the statute to give motorists the *option* of staying within the lane at their choosing. Common sense dictates that the statute is designed to keep travelers, both in vehicles and pedestrians, safe. The logical

conclusion is that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness. To believe that the statute was intended to allow motorists the option of when they will or will not abide by the lane requirement is simply not reasonable." (Emphasis sic.) Id. at ¶ 43.

The court in *Hodge* also stated that it did not intend for its decision to stand for "the proposition that movement within one lane is a per se violation giving rise to reasonable suspicion, nor does inconsequential movement within a lane give law enforcement carte blanche opportunity to make an investigatory stop." Id., 147 Ohio App.3d 550, 2002-Ohio-3053, 771 N.E.2d 331, at ¶ 45. However, when an officer could reasonably conclude from a person's driving outside the marked lanes that the person is violating a traffic law, the officer is justified in stopping the vehicle.

In this case, the trial court found that the trooper observed appellant drift across the white fog line on two occasions. The trooper had a reasonable and articulable suspicion that appellant had violated R.C. 4511.33, and after approaching the vehicle and speaking with appellant, the trooper had probable cause to arrest him for driving while under the influence of alcohol. We find no error in the trooper's decision.

*Id.,* ¶ 18-21.

{¶ 45} The *Mays* Court concluded that "a traffic stop is constitutionally valid when a law enforcement officer witnesses a motorist drift over the lane markings in violation of R.C. 4511.33, even without further evidence of erratic or unsafe driving." *Id.*, ¶ 25.

{¶ 46} We note that in *McEldowney*, upon which the State relies, this Court analyzed *Schwieterman* as follows:

In *Schweiterman*, a state trooper saw the defendant weave within his lane and cross the right edge line three times over the course of a mile. On one occasion, the defendant's tire crossed the edge line by about one foot. 2003-Ohio-615, at ¶ 3. We found that the trooper had reasonable grounds to stop and further investigate based on the fact that the defendant may have committed a traffic violation. *Id.* at ¶ 13. We stated that "[i]ndeed, absent any readily apparent cause for a motorist to have strayed from his lane of travel, a police officer reasonably may infer that it was practicable for the motorist to have stayed in his lane." *Id.*

In *Schwieterman*, we also rejected the argument that a de minimis traffic violation fails to justify a traffic stop. *Id.* at ¶ 9, citing *Whren v. United States* (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, and *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12, 1996-Ohio-431, 665 N.E.2d 1091. In this regard, we stressed in *Schwieterman* that the Ohio Supreme Court had reversed a decision of the Twelfth District Court of Appeals in a case involving very similar facts. In that case, which was *State v. Wilhelm*, the Twelfth District concluded that a police officer was not justified in making a traffic stop for a violation of R.C. 4511.33, because the statute required the driver only to stay within a single lane " 'as nearly as practicable.' " *Schwieterman*, 2003-Ohio-615, at ¶ 10, referring to *State v. Wilhelm*, 81 Ohio St.3d 444, 1998-Ohio-613, 692 N.E.2d 181. Therefore, the Twelfth

District reasoned that minor deviations would not justify a traffic stop for violating R.C. 4511.33. Based on the Supreme Court's reversal of the Twelfth District, we found the reasoning about minor deviations unpersuasive. * * *

*McEldowney*, 17-18.

{¶ 47} We have viewed the video herein, and we conclude that it is not clear, due to darkness, glare from traffic lights, and low quality of the video, how far into the adjacent lane Andrews travelled. However, the trial court specifically found Miranda's testimony to be credible. She testified that Andrews travelled over the line by one half of a tire width into the adjacent lane, and that any bump in the road did not impede his ability to remain entirely within his lane of travel. She further testified that it is common for something she clearly observes with her own eyes to not be accurately reflected in a cruiser video. We defer to the trial court's assessment of credibility, and conclude that the court's finding that Andrews traveled into the adjacent lane by half a tire width to be supported by competent and credible evidence.

{¶ 48} We further cannot agree with Andrews that the matter herein is "strikingly similar" to *Marcum*. Therein the trooper testified that he observed Marcum's "vehicle go over the solid white fog line on the right and then over the double yellow pavement line on the left." *Id.*, ¶ 4. Further, the trooper "testified that the video recording device on his cruiser did not capture the vehicle driving over the white fog line because of a small grade in the roadway." *Id.* The trooper testified, however, "that he was able to see the vehicle's tires on the right hand side completely cross over the white line. The Trooper testified that the cruiser's video did capture appellee's action in crossing over the solid

yellow line to the left into an area containing cross-hatched marking.  The video was admitted as an exhibit at the hearing."  *Id.*

{¶ 49} In ruling on Marcum's motion to suppress, the trial court indicated that "it was not convinced that appellee drove completely over the white line and that while appellee did drive on the white line, driving on the white line was not a violation of R.C. 4511.33. The trial court further found that appellee did not completely cross over the double yellow lines and that, therefore, there was no violation of R.C. 4511.33," and no basis to stop Marcum.  *Id.*, ¶ 7.  The Fifth District noted that the "trial court found that appellee drove on the white line.  Having reviewed the video recording," the Fifth District found that it "cannot say that the trial court's finding is against the manifest weight of the evidence."  *Id.*, ¶ 14.  Unlike in *Marcum*, the trial court herein specifically credited and relied upon Miranda's testimony that Andrews travelled by one half of a tire width into the adjacent lane and failed to remain entirely within his lane.

{¶ 50} We further conclude that Andrews' reliance upon *Schaffer* and *Baker* is misplaced.  In *Schaffer*, the trooper "described the conduct comprising the [marked lanes] violation as Shaffer's right side tires driving onto the white fog line one time causing the right side of Shaffer's vehicle to cross the same line for approximately three seconds. Specifically, Trooper Sisco recalled observing the right fender and the outside mirror cross the white line."  *Id.*, ¶ 19.  The Third District concluded that "the language 'as nearly as practicable' inherently contemplates *some* touching of the lane lines by a motorist's vehicle during routine and lawful driving, without the vehicle being considered to have left the lane of travel so as to constitute a marked lanes violation as proscribed by R.C. 4511.33(A)(1), such as to avoid debris, obstructions or imperfections in the

roadway." *Id.*, ¶ 21. The court concluded that "on the particular facts of this case * * * the trial court erred in determining that Trooper Sisco had a reasonable, articulable suspicion to believe Shaffer violated R.C. 4511.33(A)(1)." *Id.*, ¶ 30. We conclude that the violation herein involved more than some touching of the line by Andrews' tire, since Miranda observed ingress by Andrews' tire, and not just his fender or mirror, into the adjacent lane of traffic. In other words, Andrews did more than drive onto the marked line.

**{¶ 51}** In *Baker*, the Sixth District noted that "*Mays* sheds no light on the question of whether driving *on* the line, as opposed to driving *across* it, violates R.C. 4511.33." *Id.*, ¶ 11. The court determined as follows:

> Based on Deputy Kindle's concession that Baker drove his car *on* the marked line and not across it, and based on our review of the recording obtained from the dashboard camera of the patrol car which followed Baker's vehicle's movements, we agree with the trial court that Deputy Kindle lacked reasonable, articulable suspicion that Baker had violated R.C. 4511.33.

*Id.*, ¶ 12.

**{¶ 52}** In *Franklin*, the Fifth District noted that "the trial court found that the videotape showed that the left tires of appellant's vehicle touched the far right line of the double solid center line traffic marking. The trial court further found that the tires crossed onto the portion of the double center line by approximately 3 inches." *Id.*, ¶ 21. It was significant to the Fifth District that there "was no testimony or evidence that appellant crossed the center line, but rather that appellant drove on the marked centerline." *Id.* The

court concluded that the trooper lacked reasonable, articulable suspicion to stop Franklin for a violation of R.C. 4511.33. *Id.* Finally, in *Phillips,* the Eleventh District concluded that the evidence against Phillips was subject to suppression, since the "tires on the left side of appellant's truck touched the white broken line twice and his right tires never touched the curb." *Id.*, *3.

**{¶ 53}** Unlike the above cases, the trial court herein specifically credited Miranda's testimony that Andrews travelled into the adjacent lane of traffic by half a tire width, and that there was no basis for him to do so. Although the violation is de minimis in nature, we conclude that since Andrews failed to remain entirely within a single lane of traffic, Miranda had a reasonable, articulable suspicion that Andrews committed a marked lanes violation. Accordingly, Andrews' first assignment of error is overruled.

**{¶ 54}** Andrews' second assignment of error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO SUPPRESS STATING THAT TROOPER MIRANDA HAD REASONABLE ARTICULABLE SUSPICION OF AN OVI VIOLATION THAT JUSTIFIED ADMINISTRATION OF FIELD SOBRIETY TESTS.

**{¶ 55}** Andrews directs our attention to *State v. Spillers*, 2d Dist. Darke No. 1504, 2000 WL 299550 (March 24, 2000) and *State v. Dixon*, 2d Dist. Greene No. 2000-CA-30, 2000 WL 1760664, (Dec. 1, 2000). He asserts that Miranda merely detected an odor of alcohol "but did not witness any other forms of impairment." We disagree.

**{¶ 56}** In *Spillers*, the facts known to the officer who stopped Spillers "included

three or four marked lane violations, which the trial court found to have been 'de minimis,'[1] followed by a significant interval in which Spillers drove home with neither any traffic violations, nor any remarkable driving, together with [the officer's] detection of a 'slight' odor of an alcoholic beverage, which he believed to have been beer, and Spillers' admission that he had consumed 'a couple' of beers." *Id.*, *3. This Court determined as follows:

> The issue is close. However, we conclude that traffic violations of a de minimis nature are not sufficient, combined with a slight odor of an alcoholic beverage, and an admission to having consumed "a couple" of beers, to support a reasonable and articulable suspicion of Driving Under the Influence. Few of us drive any appreciable distance without committing traffic violations that could properly be characterized as "de minimis." By themselves, then, traffic violations of a de minimis nature are not indicative of impaired driving. Otherwise, virtually every motorist could reasonably be suspected of impaired driving, since virtually every motorist, driving a distance of several miles, will fail to signal a lane change; touch, or even slightly cross, a line marking a lane; or exceed the speed limit slightly. Furthermore, a slight odor of an alcoholic beverage, without more, is not indicative of impaired driving. The law prohibits driving under the influence of alcohol; it does not prohibit driving after the mere consumption of an alcoholic beverage. *State v. Taylor* (1981), 3 Ohio App.3d 197, at 198, 444

_____

[1] This Court noted that the de minimis violations were "sufficient to justify a stop for the purpose of issuing a citation." *Id.*, *1.

N.E.2d 481.

The closer question, of course, is whether the conjunction of these facts-nominal traffic violations combined with a slight odor of alcohol-is sufficient to create a reasonable articulable suspicion of Driving Under the Influence. Because, in our experience, virtually the entire motoring public commits nominal traffic violations regularly, we conclude that even the conjunction of these facts is insufficient to create a reasonable articulable suspicion of Driving Under the Influence. A slight odor of an alcoholic beverage is insufficient, by itself, to trigger a reasonable suspicion of DUI, and nominal traffic violations, being common to virtually every driver, add nothing of significance. Accordingly, we conclude that the trial court did not err in finding that the detention of Spillers for the purpose of administering a field sobriety test was unlawful.

*Id.,* at *3.

**{¶ 57}** In *Dixon*, the arresting officer observed what he believed to be a window tint violation. The officer's subsequent observations "included the fact that it was 2:20 in the morning, that Dixon had glassy, bloodshot eyes, that he had an odor of alcohol about his person, and that he admitted that he had consumed one or two beers." *Id.*, *2. This Court noted that, "unlike in *Spillers*, * * * a police officer did not observe any erratic driving before administering field sobriety tests. Although, in the case before us, the police officer observed glassy, bloodshot eyes, that observation is readily explained by the lateness of the hour, 2:20 a.m." *Id.* This Court concluded as follows:

The mere detection of an odor of alcohol, unaccompanied by any

basis, drawn from the officer's experience or expertise, for correlating that odor with a level of intoxication that would likely impair the subject's driving ability, is not enough to establish that the subject was driving under the influence. Nor is the subject's admission that he had had one or two beers.

*Id.*

{¶ 58} We conclude that Miranda demonstrated specific and articulable facts which, taken together with rational inferences therefrom, warranted the administration of the field sobriety tests. Miranda pursued Andrews because she believed him to be speeding upon her initial observation of him, and she observed him commit a marked lanes violation. She further stated that Andrews entered the turn lane in an inappropriate manner. Andrews advised Miranda that he had identification but failed to produce any after going through his pockets, and Miranda detected a strong and persistent, as opposed to a slight, odor of an alcoholic beverage coming from his breath. She also noticed that he had red, glassy eyes. Miranda is trained to detect whether an individual is under the influence of alcohol, and she is experienced in doing so; she testified that she encounters impaired drivers at least once a night while on patrol. In her experience, the odor of an alcoholic beverage, red glassy eyes and fumbling with papers are indicative of impairment. Andrews also provided inconsistent statements about his whereabouts prior to the stop, initially stating that he was at the Kings Table Bar, and later stating that he was at the Kevin Hart Comedy Club. He "dodged" Miranda's questions about how much alcohol he had consumed. In other words, unlike in *Spillers* and *Dixon*, based upon the totality of the circumstances herein, we conclude that Miranda had a reasonable, articulable suspicion that Andrews was driving under the influence of alcohol, thereby

justifying the administration of the field sobriety tests.  Accordingly, Andrews' second assignment of error is overruled.

{¶ 59} Having overruled Andrews' assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

Betsy A. Deeds
Kiriakos Kordalis
Hon. Beth W. Cappelli