Justice SOTOMAYOR, dissenting.
In upholding routine stops of vehicles whose owners have revoked licenses, the Court ignores key foundations of our reasonable-suspicion jurisprudence and impermissibly and unnecessarily reduces the State's burden of proof. I therefore dissent.
I
I begin with common ground. The Fourth Amendment permits "brief investigatory" vehicle stops, United States v. Cortez , 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), on "facts that do not constitute probable cause," United States v. Brignoni-Ponce , 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). To assess whether an officer had the requisite suspicion to seize a driver, past cases have considered the "totality of the circumstances-the whole picture," Cortez , 449 U.S. at 417, 101 S.Ct. 690, and analyzed whether the officer assembled "fact on fact and clue on clue," id. , at 419, 101 S.Ct. 690.
The stop at issue here, however, rests on just one key fact: that the vehicle was owned by someone with a revoked license. The majority concludes-erroneously, in my view-that seizing this vehicle was constitutional on the record below because drivers with revoked licenses (as opposed to suspended licenses) in Kansas "have already demonstrated a disregard for the law or are categorically unfit to drive." Ante , at 1188 - 1189. This analysis breaks from settled doctrine and dramatically alters both the quantum and nature of evidence a State may rely on to prove suspicion.
A
The State bears the burden of justifying a seizure. Florida v. Royer , 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); Brown v. Texas , 443 U.S. 47, 51-52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). This requires the government to articulate factors supporting its reasonable suspicion, usually through a trained agent. See Ornelas v. United States , 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ; see also United States v. Sokolow , 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). While the Court has not dictated precisely what evidence a government must produce, it has stressed that an officer must at least "articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity."
*1195 Illinois v. Wardlow , 528 U.S. 119, 123-124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting Terry v. Ohio , 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ). That articulation must include both facts and an officer's "rational inferences from those facts." Brignoni-Ponce , 422 U.S. at 880, 884, 95 S.Ct. 2574. A logical "gap as to any one matter" in this analysis may be overcome by " 'a strong showing' " regarding " 'other indicia of reliability.' " Florida v. Harris , 568 U.S. 237, 245, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013). But gaps may not go unfilled.
Additionally, reasonable suspicion eschews judicial common sense, ante , at 1188 - 1189, in favor of the perspectives and inferences of a reasonable officer viewing "the facts through the lens of his police experience and expertise." Ornelas , 517 U.S. at 699, 116 S.Ct. 1657 ; Cortez , 449 U.S. at 416-418, 101 S.Ct. 690 (explaining that the facts and inferences giving rise to a stop "must be seen and weighed ... as understood by those versed in the field of law enforcement"); Heien v. North Carolina , 574 U.S. 54, 73, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (SOTOMAYOR, J., dissenting) ("[O]ur enunciation of the reasonableness inquiry and our justification for it ... have always turned on an officer's factual conclusions and an officer's expertise with respect to those factual conclusions"). It is the reasonable officer's assessment, not the ordinary person's-or judge's-judgment, that matters.[1]
Finally, a stop must be individualized-that is, based on "a suspicion that the particular [subject] being stopped is engaged in wrongdoing." Cortez , 449 U.S. at 418, 101 S.Ct. 690 ; Prado Navarette v. California , 572 U.S. 393, 396-397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014). This does not mean that the officer must know the driver's identity. But a seizure must rest on more than the "likelihood that [a] given person" or particular vehicle is engaged in wrongdoing. Brignoni-Ponce , 422 U.S. at 886-887, 95 S.Ct. 2574. The inquiry ordinarily involves some observation or report about the target's behavior-not merely the class to which he belongs. See, e.g. , Navarette , 572 U.S. at 398, 402, 134 S.Ct. 1683 (upholding vehicle stop based on an anonymous tip about driver conduct, interpreted in light of the "accumulated experience of thousands of officers"); Sokolow , 490 U.S. at 10, 109 S.Ct. 1581 (evaluating the collective facts giving rise to suspicion that an individual was transporting narcotics instead of relying on law enforcement's simplified drug courier " 'profile' ").
B
Faithful adherence to these precepts would yield a significantly different analysis and outcome than that offered by the majority.
For starters, the majority flips the burden of proof. It permits Kansas police officers to effectuate roadside stops whenever they lack "information negating an inference" that a vehicle's unlicensed owner is its driver. Ante , at 1186 - 1187. This has it backwards: The State shoulders the burden to supply the key inference that *1196 tethers observation to suspicion. The majority repeatedly attributes such an inference to Deputy Mehrer. Ante , at 1188, 1189, 1191. But that is an after-the-fact gloss on a seven-paragraph stipulation. Nowhere in his terse submission did Deputy Mehrer indicate that he had any informed belief about the propensity of unlicensed drivers to operate motor vehicles in the area-let alone that he relied on such a belief in seizing Glover. Ante , at 1186 - 1187.
The consequence of the majority's approach is to absolve officers from any responsibility to investigate the identity of a driver where feasible. But that is precisely what officers ought to do-and are more than capable of doing. Of course, some circumstances may not warrant an officer approaching a car to take a closer look at its occupants. But there are countless other instances where officers have been able to ascertain the identity of a driver from a distance and make out their approximate age and gender. Indeed, our cases are rife with examples of officers who have perceived more than just basic driver demographics. See, e.g. , Heien , 574 U.S. at 57, 135 S.Ct. 530 (officer thought that motorist was " 'very stiff and nervous' "); United States v. Arvizu , 534 U.S. 266, 270, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (officer observed an "adult man" driving who "appeared stiff"); United States v. Ross , 456 U.S 798, 801, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (officer pulled alongside car and noticed that the driver matched a description from an informant); Brignoni-Ponce , 422 U.S. at 875, 95 S.Ct. 2574 (officers stopped a vehicle whose occupants "appeared to be of Mexican descent"). The majority underestimates officers' capabilities and instead gives them free rein to stop a vehicle involved in no suspicious activity simply because it is registered to an unlicensed person. That stop is based merely on a guess or a "hunch" about the driver's identity. Wardlow , 528 U.S. at 124, 120 S.Ct. 673 (internal quotation marks omitted).
With no basis in the record to presume that unlicensed drivers routinely continue driving, the majority endeavors to fill the gap with its own "common sense." Ante , at 1188 - 1189. But simply labeling an inference "common sense" does not make it so, no matter how many times the majority repeats it. Cf. ante , at 1188 - 1189, 1189, 1189 - 1190, 1190. Whether the driver of a vehicle is likely to be its unlicensed owner is "by no means obvious." Ante , at 1192 (KAGAN, J., concurring). And like the concurrence, I "doubt" that our collective judicial common sense could answer that question, even if our Fourth Amendment jurisprudence allowed us to do so. Ante , at 1187 - 1188.
Contrary to the majority's claims, ante , at 1187 - 1189, 1189 - 1190, the reasonable-suspicion inquiry does not accommodate the average person's intuition. Rather, it permits reliance on a particular type of common sense-that of the reasonable officer, developed through her experiences in law enforcement. Cortez , 449 U.S. at 418, 101 S.Ct. 690. This approach acknowledges that what may be "common sense" to a layperson may not be relevant (or correct) in a law enforcement context. Indeed, this case presents the type of geographically localized inquiry where an officer's "inferences and deductions that might well elude an untrained person" would come in handy. Ibid. ; see also Arvizu , 534 U.S. at 276, 122 S.Ct. 744 (prizing an officer's "specialized training and familiarity with the customs of the area's inhabitants"). By relying on judicial inferences instead, the majority promotes broad, inflexible rules that overlook regional differences.
Allowing judges to offer their own brand of common sense where the State's proffered justifications for a search come up short also shifts police work to the judiciary.
*1197 Our cases-including those the majority cites-have looked to officer sensibility to establish inferences about human behavior, even though they just as easily could have relied on the inferences "made by ordinary people on a daily basis." Ante , at 1189. See, e.g. , Navarette , 572 U.S. at 402, 134 S.Ct. 1683 (pointing to "the accumulated experience of thousands of officers" to identify certain "erratic" behaviors "as sound indicia of drunk driving"); Wardlow , 528 U.S. at 124, 120 S.Ct. 673 (permitting officers to account for the relevant characteristics of a location when interpreting whether flight from police is "evasive"); Sokolow , 490 U.S. at 9-10, 109 S.Ct. 1581 (crediting the evidentiary significance of facts "as seen by a trained agent" to identify a suspicious traveler). There is no reason to depart from that practice here.
Finally, to bolster its conclusion as grounded in "common experience," the majority cites "empirical studies." Ante , at 1188. But its use of statistics illustrates the danger of relying on large-scale data to carry out what is supposed to be a particularized exercise. Neither of the referenced reports tells us the percentage of vehicle owners with revoked licenses in Kansas who continue to drive their cars. Neither report even offers a useful denominator: One lumps drivers with suspended and revoked licenses together, while the other examines the license status of only motorists involved in fatal collisions. The figures say nothing about how the behavior of revoked drivers measures up relative to their licensed counterparts-whether one group is more likely to be involved in accidents, or whether the incidences are comparable-which would inform a trooper's inferences about driver identity.
As the concurrence recognizes, while statistics may help a defendant challenge the reasonableness of an officer's actions, they "cannot substitute for the individualized suspicion that the Fourth Amendment requires." Ante , at 1193, n. If courts do not scrutinize officer observation or expertise in the reasonable-suspicion analysis, then seizures may be made on large-scale data alone-data that say nothing about the individual save for the class to which he belongs. That analytical approach strays far from "acting upon observed violations" of law-which this Court has said is the "foremost method of enforcing traffic and vehicle safety regulations." Delaware v. Prouse , 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
The majority today has paved the road to finding reasonable suspicion based on nothing more than a demographic profile. Its logic has thus made the State's task all but automatic. That has never been the law, and it never should be.
II
The majority's justifications for this new approach have no foundation in fact or logic. It supposes that requiring officers to point to "training materials or field experiences" would demand " 'scientific certainty.' " Ante , at 1187 - 1188. But that is no truer in this case than in other circumstances where the reasonable-suspicion inquiry applies. Indeed, the State here was invited to stipulate to the evidence it relied on to make the stop. It could have easily described the individual or "accumulated experience" of officers in the jurisdiction. Cf. Navarette , 572 U.S. at 402, 134 S.Ct. 1683. The State chose not to present such evidence and has not shown that it could not have done so. Accordingly, it has proved no harm to itself.[2]
*1198 In fact, it is the majority's approach that makes scant policy sense. If the State need not set forth all the information its officers considered before forming suspicion, what conceivable evidence could be used to mount an effective challenge to a vehicle stop, as the concurrence imagines? Ante , at 1188. Who could meaningfully interrogate an officer's action when all the officer has to say is that the vehicle was registered to an unlicensed driver? How would a driver counter that evidence-by stating that they were of a different age or gender than the owner and insisting that the officer could have easily discerned that? And where would a defendant bring his arguments if the trial judge makes the key inference, or by the same token, fails to make an inference that "might well elude" the untrained? Cortez , 449 U.S. at 418, 101 S.Ct. 690.
Moreover, the majority's distinction between revocation and suspension may not hold up in other jurisdictions. For one, whether drivers with suspended licenses have "demonstrated a disregard for the law or are categorically unfit to drive" is completely unknown. And in several States, the grounds for revocation include offenses unrelated to driving fitness, such as using a license to unlawfully buy alcohol. See, e.g. , Ky. Rev. Stat. Ann. § 186.560 (West Cum. Supp. 2019); Mont. Code Ann. § 61-5-206 (2019); R. I. Gen. Laws § 31-11-6 (2010). In yet other jurisdictions, "revocation" is the label assigned to a temporary sanction, which may be imposed for such infractions as the failure to comply with child support payments. Okla. Stat., Tit. 47, § 6-201.1 (2011). Whether the majority's "common sense" assumptions apply outside of Kansas is thus open to challenge.
* * *
Vehicle stops "interfere with freedom of movement, are inconvenient, and consume time." Prouse , 440 U.S. at 657, 99 S.Ct. 1391. Worse still, they "may create substantial anxiety" through an "unsettling show of authority." Ibid. Before subjecting motorists to this type of investigation, the State must possess articulable facts and officer inferences to form suspicion. The State below left unexplained key components of the reasonable-suspicion inquiry. In an effort to uphold the conviction, the Court destroys Fourth Amendment jurisprudence that requires individualized suspicion. I respectfully dissent.

Of course, aggregate statistics of this kind cannot substitute for the individualized suspicion that the Fourth Amendment requires. See, e.g., Terry v. Ohio , 392 U.S. 1, 21, n. 18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Th[e] demand for specificity ... is the central teaching of this Court's Fourth Amendment jurisprudence"). But in a case like this one, the officer's suspicion is individualized: It arises from the license status of the known owner of a specific car. The only question is whether that suspicion is reasonable-whether, in other words, there is enough to back up the officer's belief that the owner is driving the vehicle. As to that matter, statistics may be highly relevant, either to support or to cast doubt on the officer's judgment.

Cortez explained why this is so. Law enforcement officers, behaving akin to "jurors as factfinders," have "formulated certain commonsense conclusions about human behavior" as it relates to "the field of law enforcement." 449 U.S. at 418, 101 S.Ct. 690. A trained officer thus "draws inferences and makes deductions-inferences and deductions that might well elude an untrained person." Ibid. ; see also United States v. Arvizu , 534 U.S. 266, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (crediting officer assessment of driver behavior that was based on "his specialized training and familiarity with the customs of the area's inhabitants").

The majority suggests that requiring the State to supply the missing link between fact and suspicion would "considerably narrow the daylight" between the reasonable-suspicion showing and that required to establish probable cause. Ante , at 1189 - 1190. But that may simply be a feature of this unique context, where the difference between a permissible and impermissible stop turns on a single fact. Given that reasonable suspicion and probable cause are not "reducible to 'precise definition or quantification,' " Florida v. Harris , 568 U.S. 237, 243, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), the gradation between the two is bound to vary from case to case.